2002 WY 132

Mary **NEWMAN**, N.D. Morgan, Jr., Marshall Morgan, Karla Denzin, Lynda Morgan, Mitzi Harris, Mike Walters, Jane Cowan, Alice Morgan, Richard Morgan, Jim and Jolene Freeburn, Toni Nelson, Chuck Morgan, Kristi Fluharty, Joanne McGuire, Lisa Sigler and Rock Morgan (the "Morgan Mineral Heirs"), Appellants (Plaintiffs),

v.

**RAG WYOMING LAND COMPANY**, a Delaware corporation, and Hi-pro Production, LLC, a Wyoming Limited Liability Company, Appellees (Defendants).

No. 01–209.

Supreme Court of Wyoming.

Sept. 6, 2002.

Rehearing Denied Oct. 1, 2002.

Representing Appellants: Clay B. Jenkins of Jenkins Law Office, Sheridan, Wyoming.

Representing Appellee RAG Wyoming Land Company: Joseph E. Hallock and James L. Edwards of Stevens, Edwards & Hallock, P.C., Gillette, Wyoming.

Representing Appellee Hi–Pro Production, LLC: Dan B. Riggs, David C. Smith, and Michael C. Steel of Lonabaugh and Riggs, Sheridan, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1]   In 1968, the landowners, who owned both the surface and mineral estate in certain Campbell County property, leased their ranch for oil and gas development.  Production occurred, and the lease remained held by that production.  The landowners deeded the surface of the ranch and "coal and minerals commingled with [the] coal" to a neighboring coal mine operator in 1974, reserving all "oil, gas, and other minerals" not otherwise conveyed.  Twenty years later, development of the gas found within the coal, known as "coalbed methane," became commercially feasible.  A coalbed methane operator obtained an assignment of the oil and gas leasehold rights from the surface to a depth of 1,000 feet and began development of the coalbed methane.  The successors in interest to the landowners claimed their right to royalties on the coalbed methane; however, the coalbed methane operator paid all royalties to the coal operator.  The landowners filed a complaint seeking a declaratory judgment as to the ownership of the coalbed methane and recovery of the unpaid royalties.  The district court granted summary judgment in favor of the coal operator.  We reverse.

## ISSUES

[¶ 2]   The Morgan Mineral Heirs present the following issue for our review:

Do deeds which grant:

---

* Chief Justice at time of oral argument.

All coal and minerals co-mingled with coal that may be mined or extracted in association therewith or in conjunction with coal mining operations

But reserve:

All oil, gas and other minerals except as set forth above

Convey coal bed methane gas, or not?

RAG Wyoming Land Company (RAG) restates the issue as: "Was the district court correct in granting summary judgment to Appellees by ruling that coalbed methane gas was conveyed by Appellants through the warranty deeds?" Hi–Pro Production, LLC (Hi–Pro) phrases the issue as:

Do warranty deeds which grant "all coal and minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal operations" and which reserve "all oil, gas and other minerals except as set forth above" convey coalbed methane gas ("CBM") as produced from the Wyodak coal seam?

## FACTS

[¶ 3] In 1968, Alfreda M. Morgan and Norvin D. Morgan, Sr. (landowners), the owners of the surface and mineral estate in certain lands in Campbell County and descendants and heirs of the original homesteaders, gave an oil and gas lease to W.R. Gibson, doing business as Powder River Oil Company, granting him the right to produce "oil, gas, and casinghead gas, and other minerals" and retaining a one-eighth royalty interest in the oil and "the proceeds from the sale of the gas, as such, for gas from wells where gas is found." Production occurred on those lands, and royalties were paid to the landowners. In 1971, Meadowlark Farms, Inc. (Meadowlark), predecessor in interest to RAG (coal operator), began surface coal mining operations on state and federal coal leases in the area. In 1974, Meadowlark entered into an Option to Acquire Real Property with the landowners which granted an option for it to acquire the landowners' ranch which consisted of approximately 1,560 acres together with "all coal and minerals co-mingled with coal owned by SELLERS." The landowners owned the coal under approximately 200 acres of the property. The option also provided that, upon execution, the landowners were entitled to lease the surface for farming and ranching purposes upon payment of a sum equal to the assessed property taxes. Meadowlark exercised the option and purchased the property. The warranty deed conveyed the lands and "all coal and minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal operations" and reserved to the grantor "all oil, gas and other minerals except as set forth above."

[¶ 4] Oil and gas production, coal mining, and ranching proceeded simultaneously without dispute, and the landowners received the royalties from all oil and gas production. At some point in time, the oil and gas lease was assigned to Torch Energy Advisors (Torch). In the early 1990s, techniques for the production of gas found within the coal seam, or coalbed methane, were developed and became commercially feasible. Although unclear from the record, it appears that, by 1997, production of coalbed methane had begun with six wells located on federal coal lands and two wells located on the lands subject to the landowners' oil and gas lease. Upon learning of the coalbed methane wells in 1997, Marshall Morgan, one of the heirs of the landowners, wrote a letter to Torch informing it of his interest in the oil and gas and demanding his share of the royalty payments. On the basis of Mr. Morgan's claim, Torch began escrowing the royalty payments which apparently it had been previously sending to the coal operator. As of September 1998, a total of $106,682.09 had been escrowed. Ultimately, RAG, the coal operator, and Torch entered into an indemnity agreement wherein RAG agreed to indemnify Torch from all liability in exchange for its agreement to resume making royalty payments to RAG. Torch assigned a portion of its interest in the oil and gas lease from the surface to 1,000 feet beneath the surface to Hi–Pro effective May 1, 2000.

[¶ 5] RAG entered into two surface use licenses and agreements for coalbed methane development with Hi–Pro which provided for coordination in the development of the coal and coalbed methane resources. In the

agreement applicable to the lands subject to the landowners' oil and gas lease, RAG claimed "legal rights in certain coalbed methane gas wells, locations, [and] leases." In exchange for RAG's allowing Hi–Pro access to the area, Hi–Pro agreed to pay RAG forty percent of the market value of the gas produced and agreed its rights were "subordinate to and subject to the continuous and uninterrupted right of RAG ... to mine coal and conduct surface coal mining operations." In the agreement applicable to other lands— presumably the federal coal lands, Hi–Pro agreed to a similar subordination of its interests and a much lower price of one and three-quarters percent on gas from the Wyodak coal seam and two percent on coalbed methane produced from any other coal seam. The agreements also provided for lengthy, detailed procedures and obligations to ensure the coalbed methane development did not interfere with RAG's coal mining operation.

## DISCUSSION

[¶ 6] The existence of coalbed methane has been well known for over a century. Paul N. Bowles, *Coalbed Gas: Present Status of Ownership Issue and Other Legal Considerations*, 1 Eastern Min. L. Inst. § 7.03 (1980). In fact, flash fires occasionally occurred on drilling rigs for many years when wells were drilled through the coal seam, and ventilation of underground mines was necessary to prevent fires and explosions. Michelle D. Baldwin, Book Note, *Ownership of Coalbed Methane Gas: Recent Developments in Case Law*, 100 W. Va. L.Rev. 673 (1998). Historically, coalbed methane "had long been considered a dangerous waste product of coal mining." *Amoco Production Co. v. Southern Ute Indian Tribe*, 526 U.S. 865, 871, 119 S.Ct. 1719, 144 L.Ed.2d 22 (1999).

[¶ 7] In the 1970s, the value of coalbed methane was recognized, and government grants became available to encourage its development. *Id.* In 1981, the Solicitor of the Department of the Interior issued an opinion addressing the ownership of coalbed methane in federal coal deposits concluding the reservation of coal to the United States in patents issued after 1909 did not include coalbed

methane. In reliance on that opinion, oil and gas operators began entering into leases to develop coalbed methane with individual landowners who owned the oil and gas. *Id.* In the early 1990s, techniques for efficient development of coalbed methane, specifically within the coal deposits in the Powder River Basin in Wyoming, were perfected. In 1991, litigation ensued between the federal government and certain Indian tribes which claimed the government's reservation of coal in 1909 and 1910 included the coalbed methane on lands originally owned by the government which now belonged to them. Ultimately, that issue was resolved when the United States Supreme Court held coalbed methane was not included within the reservation of coal and overruled district and circuit court decisions which had concluded coalbed methane was owned by the owner of the coal. *Id.* at 874.

[¶ 8] Commercial development of coalbed methane in the Powder River Basin began in the early 1990s. Prior to that time, coalbed methane escaped from the coal in the course of the open pit surface mining process, and no attempt was made to capture that gas as a valuable resource.

[¶ 9] A brief discussion of the chemistry and the composition of methane and coal is in order. Coalbed methane is chemically identical ($CH_4$) to gas produced through conventional methods, and each is known as "natural gas." Methane or natural gas originates from the decay of organic material over time under great pressure and temperature. Whether that process occurs in coal deposits or at greater depths, the result is the same— natural gas is produced. The process which transforms organic material into coal is known as coalification.

The coalification process generates methane and other gases. Because coal is porous, some of that gas is retained in the coal. CBM gas exists in the coal in three basic states: as free gas; as gas dissolved in the water in coal; and as gas "adsorbed" on the solid surface of the coal, that is, held to the surface by weak forces called van der Waals forces. These are the same three states or conditions in which gas is stored in other rock formations. Because

of the large surface area of coal pores, however, a much higher proportion of the gas is adsor[b]ed on the surface of coal than is adsor[b]ed in other rock. When pressure on the coalbed is decreased, the gas in the coal formation escapes.

*Id.* at 873 (citations omitted).

[¶ 10] Natural gas or methane, whether located in a sandstone reservoir or a coal seam, is produced by creating a pressure differential between the well bore and the reservoir. In the Powder River Basin, coalbed methane production involves the removal of water from the coal formation, which reduces the pressure and allows the gas to escape. Likewise, methane will migrate naturally from coal seams, as well as from other reservoirs, to other porous or permeable strata depending on pressure differentials.

[¶ 11] The issue to be resolved in this case is whether the parties to the deed in question intended the coalbed methane to be conveyed along with the coal estate or reserved to the grantor as part of the oil and gas estate. The parties agree the governing principle of contract construction is determination of the parties' intent from the language of the instrument itself. As we stated most recently in the context of interpreting a mineral conveyance:

"According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." *Amoco Production Company v. EM Nominee Partnership Company*, 2 P.3d 534, 539–40 (Wyo.2000) (citations omitted).

Assignments are contracts and are construed according to the rules of contract interpretation. The determination of the parties' intent is our prime focus in interpreting or construing a contract. If an agreement is in writing and its language is clear and unambiguous, the parties' intention is to be secured from the words of the agreement. When the agreement's language is clear and unambiguous, we consider the writing as a whole, taking into account relationships between various parts. In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract.

*Boley v. Greenough*, 2001 WY 47, ¶¶ 10–11, 22 P.3d 854, ¶¶ 10–11 (2001) (some citations omitted). Although substantial disagreement exists over the meaning of the deed, neither party suggests the language of the deed is ambiguous. Differing interpretations of contracts alone do not constitute ambiguity requiring extrinsic evidence. *Moncrief v. Louisiana Land and Exploration Company*, 861 P.2d 516, 524 (Wyo.1993).

[¶ 12] We must first examine the terms of the deed and give them their plain and ordinary meaning. *Wolter v. Equitable Resources Energy Company, Western Region*, 979 P.2d 948, 951 (Wyo.1999); *Pete Lien & Sons, Inc. v. Ellsworth Peck Construction Co.*, 896 P.2d 761, 763 (Wyo.1995). Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Moncrief*, 861 P.2d at 524.

[¶ 13] The language of the deed conveys "all coal and minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal operations" and reserves "all oil, gas and other minerals except as set forth above." The first term the parties argue must be interpreted is "minerals." We have little trouble concluding natural gas produced from the coal seam is a mineral under Wyoming law. *Amoco Production Company v. Guild Trust*, 461 F.Supp. 279, 283 (D.Wyo. 1978), *aff'd*, 636 F.2d 261 (10th Cir.1980); *Union Pacific Land Resources Corporation v. Moench Investment Company*, 696 F.2d 88, 93 (10th Cir.1982); *State ex rel. School Dist. No. 1 in Weston County v. Snyder*, 29

Wyo. 163, 212 P. 758 (1923). However, this conclusion does little to resolve this dispute because "minerals" are both granted and reserved.

[¶ 14] The determinative question is whether the parties intended "minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal operations" to include natural gas found in the coal seam. We are unable to discern any unique meaning of "commingled" in the context of minerals. The word "commingle" is defined by Webster's New World Dictionary as "to mingle together; intermix; blend." Webster's New World Dictionary 285 (2nd C. ed.1972). The term does not suggest any sort of chemical change must occur to constitute commingling but only a mixing together. Given the three states of coalbed methane as free gas within the cleats and matrixes of the coal, gas dissolved in water in the coal pores, and gas adsorbed onto the solid surface of the coal, it appears to be "mixed together" with the coal within the meaning of the terms of the deed.

[¶ 15] In addition to being commingled with the coal, the other "minerals" conveyed must be those that "may be mined or extracted in association" with the coal or "in conjunction with such coal operations." Likewise, these terms must be given their plain and ordinary meaning to reasonable persons at the same time and place of their use; i.e., 1974 in the Powder River Basin of Wyoming. The coal operator argues that production of gas has been considered "mining" relying on *Coronado Oil Company v. Grieves,* 603 P.2d 406 (Wyo.1979), *Amoco Production Company v. Guild Trust,* 636 F.2d 261, 263–65 (10th Cir.1980), and the language of oil and gas leases, including those issued by the landowners in this case. While those references certainly establish that oil and gas production through the drilling of wells has been considered "mining," they do not answer the question posed in this case because all agree that, in 1974 when the warranty deed in question was drawn, any gas found in the coal seam was not mined

through a well bore but was ventilated or wasted while the coal was produced by excavation in the course of surface mining. In addition, the minerals conveyed by the language of the deed were only those mined "in association therewith or in conjunction with such coal operations." Webster's New World Dictionary confirms the ordinary meaning of "in association" and "in conjunction" to be "together." No party contends coalbed methane is somehow captured together with the coal as it is mined. Rather, it is released and escapes during the mining process. *Southern Ute Indian Tribe,* 526 U.S. at 873, 119 S.Ct. 1719. In the case of underground mines, it must be ventilated. *United States Steel Corporation v. Hoge,* 503 Pa. 140, 468 A.2d 1380, 1382 (1983).

[¶ 16] Is the plain meaning of "extracted" the same as "released," "escaped," or "ventilated"? It is obvious these words connote different actions, and the distinctions between them are crucial to determining the intent of the parties to this deed. Webster's New World Dictionary confirms that difference by defining (1) "extract" as "to draw out by effort; pull out" and "to remove or separate (metal) from ore"; (2) "release" as "to set free"; and (3) "ventilate" as "to provide with an opening for the escape of air, gas, etc." [1] Under the plain meaning of the terms chosen by the parties to the deed, we cannot conclude they intended to include coalbed methane gas as a mineral "mined or extracted in association therewith or in conjunction with such coal operations" when it can only be produced through wells as any other gas.

[¶ 17] We could end the inquiry at this point. However, because of the importance of the issue of the ownership of coalbed methane in general and the extensive consideration of this issue by other courts and commentators which we find helpful and consistent with our initial conclusion, further discussion is warranted.

[¶ 18] The coal operator poses a creative argument suggesting that, because coalbed methane can most efficiently be produced in advance of the mining operations thereby

---

1. The referenced definition of "ventilate" is one of several definitions but was chosen as the most

appropriate to the circumstances of this appeal.

reducing the water the mine must contend with and making the mine more economically successful, it is mined or extracted "in association therewith" or "in conjunction with" coal mining operations. Two problems exist with that argument. First, the gas production does not occur automatically in the process of overburden and coal excavation and removal. Instead, it only occurs when and if the coal operator decides to undertake gas well drilling in advance of the mine face. Second, such "mining" techniques—the coordination of well drilling and mine excavation—did not exist until twenty years after the deed in question was drawn which poses the broader question in this case. How is the parties' intent to be determined when minerals become valuable long after a conveyance by (1) discovery of new methods of production; (2) changes in economics making production of a previously known, but unwanted, mineral profitable; (3) or discovery of the presence of minerals not previously known to exist? Obviously, the language of the particular documents involved affects the answer to this question on a case-by-case basis.

[¶ 19] In this particular case, no reference is made in the deed to coalbed methane, and no other language can be said to address the parties' specific intent with regard to it. In circumstances like those present here, a search for the parties' specific intent produces little fruit because the identity, value, or feasibility of production was unknown to the parties at the time of the conveyance and, therefore, they likely had no intent at all with regard to the substance in question. Consequently, we must focus upon the general intent of the parties, concentrating on the "purposes of the grant in terms of respective manner of enjoyment of surface and mineral estates." Comment, *New Values Under Old Oil and Gas Leases: Helium, Who Owns It?*, 62 Mich. L.Rev. 1158, 1169 (1964).

> The intention sought should be the *general intent* rather than any supposed but unexpressed *specific intent*, and, further, that general intent should be arrived at, not by defining and re-defining the terms used, but by considering the *purposes* of the grant or reservation in terms of manner of enjoyment intended in the ensuing interests.

Eugene O. Kuntz, *The Law Relating to Oil and Gas in Wyoming*, 3 Wyo. L.J. 107, 112 (1949). It can be said this approach would favor the conclusion that the coalbed methane, which unquestionably has the chemical composition of gas, belongs to the gas owner who is entitled to recover all gas beneath the surface wherever found unless, of course, specifically limited by the original conveyance. Edward A. Craig, III & Marlee S. Myers, *Ownership of Methane Gas in Coalbeds*, 24 Rocky Mtn. Min. L. Inst. 767 (1978). However, the coal owner argues that, because the gas is located within the coal seam, its right to mine, and thereby ventilate or waste the coalbed methane, implies ownership. Consequently, the court is faced with determining whether that right is tantamount to ownership or simply incidental to the right to mine. *Id.* at 784.

[¶ 20] Coalbed methane ownership has been the subject of litigation for the last twenty years in a variety of forums with differing results. 1 Howard R. Williams & Charles J. Meyers, Oil and Gas Law § 219 at 274.5 to 274.10 (2000). As noted in the most recent and thorough discussion of this issue, "[t]he conflicting legal principles and the existing precedent ... do not point toward any one of these solutions as necessarily or even probably correct, so a court could adopt any one of the approaches described below." Jeff L. Lewin et al., *Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane*, 94 W. Va. L.Rev. 563, 614 (1992). While no other case is on all fours with the facts herein, the approaches taken by other courts provide insight and guidance to our deliberations. The earliest case occurred in Pennsylvania and favored the coal owner relying on the "ownership in place" theory of oil and gas ownership and on the specific language of the conveyance which reserved to the gas owner only the "right to drill and operate through said coal for oil and gas." *Hoge*, 468 A.2d at 1384. Reasoning that the method of production of coalbed methane, which involved hydrofacturing, had the potential of causing damage to the coal seam and increasing danger in the underground coal mine, the court found the coal owner had title to the entire

strata and all gas found within it. *Id.* At the time of the conveyance, coalbed methane was primarily considered a dangerous waste product that had to be vented to allow for the safe production of coal, and, consequently, the court found it unlikely the parties would have intended to reserve it. *Id.* at 1384–85. However, the opposite conclusion could just as easily be drawn; e.g., the purchaser would not likely intend to purchase a dangerous waste product. Following established Pennsylvania precedent, the court concluded ownership of gas belonged to the owner in fee of the property wherein it was found to exist, apparently concluding that property was the coal seam. *Id.* at 1383.

[¶ 21] In Alabama, the courts have had several opportunities to consider the dispute over ownership of this mineral resource. Where the document reserving the oil and gas was "subject to the requirement that all coal seams located in said lands penetrated in such exploration or drilling operations shall be encased or grouted off," the court had no difficulty concluding the parties intended to separate the coalbed methane from the rest of the oil and gas present in other formations. *Rayburn v. USX Corp.*, Civ. No. 85–G–2661–W, 1987 WL 470907, *2, 1987 U.S. Dist. LEXIS 6920, at *6 (N.D.Ala. July 29, 1987), *affm'd*, 844 F.2d 796 (11th Cir.1988). In a later Alabama case, *Hoge* was discussed at length, and its rationale was distinguished both on the specific language of the deed and by reliance on the "rule of capture" as opposed to the "ownership in place" rule. *NCNB Texas National Bank, N.A. v. West*, 631 So.2d 212 (Ala.1993). Under the rule of capture, a landowner acquires title to all the oil and gas which could be produced even if some of the oil and gas migrated from adjoining lands. *Id.* at 224 (quoting Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas*, 13 Tex. L.Rev. 391, 393 (1935)). Although the Alabama Supreme Court saw the rule of capture in that jurisdiction as significant, at the same time, it recognized those rules of ownership apply more to disputes between neighboring gas producers than conflicts over who has the right to recover coalbed methane. *Id.* at 223; Lewin, 94 W. Va. L.Rev., *supra* at 592–93, 619.

[¶ 22] Despite these distinctions, the Alabama Supreme Court found that a deed, which granted "all the coal and connected mining rights" but reserved "all of the gas," conveyed the coalbed methane located within the coal seam. However, it did not include gas which had escaped into the material left after longwall mining was completed (the "gob zone"). The court seemed focused upon the bundle of property rights incident and necessary to the recovery of the coal and the potential for interference with those rights in the facts of that case.[2] At the same time, the court found

> no scientific or legal basis to support the proposition that coalbed methane gas should be treated as a resource separate and distinct from other natural gas, or from any other gas. The fact that the coalbed methane gas is produced by, and stored within, coal seams does not require the conclusion that a grant of "all coal" includes coalbed methane gas, nor does it require the conclusion that a reservation of "all gas" does not include coalbed methane gas.

*NCNB Texas National Bank, N.A.*, 631 So.2d at 222–23 (footnote omitted). In addition, the Alabama Supreme Court found the dissent in *Hoge* to be compelling when it stated:

> "Given their awareness of the presence of coalbed gas in the stratum, the earlier described similarities between coalbed gas and what has commonly been referred to as 'natural gas', and the fact that the unrestricted term 'gas' was employed in the reservation clause, we believe the plain meaning of the term 'gas' would be too far subverted were we to exclude coalbed gas as a recoverable gas."

*Id.* at 226 (quoting *Hoge*, 468 A.2d at 1389 (Flaherty, J., dissenting)). It appears to us

---

**2.** This dispute arose over an underground mine where coalbed methane was produced through both horizontal and vertical wells which were hydrofractured to enhance production and wells drilled into the mine area after longwall mining was completed and subsidence created a "gob" of rubble into which coalbed methane collected. *NCNB Texas National Bank, N.A.*, 631 So.2d at 215.

the Alabama Supreme Court was convinced that coalbed methane was included within the term "gas" as utilized by the parties to the deed in question and, despite its statements to the contrary, was overly concerned about the possible conflicts if coalbed methane and coal were owned separately. In addition, its conclusion which grants title to the coal owner of the coalbed methane recovered prior to mining through horizontal and vertical drilling but title to the gas owner of gas left in the gob zone after mining fails, in our opinion, achieves the certainty and fairness all desire.

[¶ 23] In contrast, the Montana Supreme Court reached the opposite conclusion that the conveyance of "all coal and coal rights" did not include coalbed methane but did so by relying on the same ownership in place theory of oil and gas ownership which the Pennsylvania court utilized to arrive at the opposite conclusion in *Hoge*. *Carbon County v. Union Reserve Coal Co., Inc.*, 271 Mont. 459, 898 P.2d 680, 685 (1995). Looking also to state statutes defining "coal" and "gas" and common meanings of the terms as provided by dictionaries, the Montana Supreme Court construed the plain meaning of the language of the deed in question as conveying only the solid mineral—coal.

[¶ 24] Struggling to articulate clear rules for the resolution of this difficult issue, the courts, especially when these cases are considered together, displayed confusing and inconsistent reasoning. While lip service is paid to the role of the theory of ownership of oil and gas in the respective jurisdictions, the ultimate rulings do not depend on which theory of ownership applies. In both ownership in place and rule of capture jurisdictions, courts have concluded the gas owner is entitled to all the gas it can capture, yet the coal owner owns the coalbed methane. We agree with those courts and commentators which have rejected reliance upon the nature

of the ownership interest in oil and gas to resolve this question. Lewin, 94 W. Va. L.Rev., *supra* at 563. In addition, neither rule of ownership has been clearly adopted by this court to date, nor has the distinction been considered of any significant legal consequence. Mark W. Gifford, *The Law of Oil and Gas in Wyoming: An Overview*, 17 Land & Water L.Rev. 401, 404 (1982).[3]

[¶ 25] The most recent ruling on the issue of ownership of coalbed methane involved determining the intent of Congress in reserving "all coal" from lands patented under the Coal Lands Acts of 1909 and 1910. Reversing the Tenth Circuit Court of Appeals, the United States Supreme Court ended a long running controversy over ownership of coalbed methane in federal coal deposits.[4] In doing so, the court did not follow the confusing array of state court cases and relied instead upon the plain meaning of the terms at issue to conclude Congress did not intend the term "coal" to include coalbed methane. *Southern Ute Indian Tribe*, 526 U.S. 865, 119 S.Ct. 1719. While the issues raised by the deed in question in this case are not identical to those faced in *Southern Ute Indian Tribe*, the Supreme Court's reasoning is applicable and persuasive to determining the intent of the parties herein.

[¶ 26] The Supreme Court looked to dictionary definitions which defined coal as a solid fuel resource and methane as a distinctly separate substance. *Id.* at 874, 119 S.Ct. 1719.

As these dictionary definitions suggest, the common understanding of coal in 1909 and 1910 would not have encompassed CBM gas, both because it is a gas rather than a solid mineral and because it was understood as a distinct substance that escaped from coal as the coal was mined, rather than as a part of the coal itself.

3. Mr. Gifford notes: "Ultimately, the determination of whether nonownership theory or ownership in place theory applies to interests in oil and gas in Wyoming is of small consequence" and provides as authority for that conclusion 1 Howard R. Williams & Charles J. Meyers, Oil and Gas Law § 203.1 (1981). Gifford, 17 Land & Water L.Rev., *supra* at 404.

4. Only 200 acres of the coal owner's surface mine in this case involved private coal. The remainder, and the vast majority of the coal, consisted of federal coal. Consequently, pursuant to the *Southern Ute Indian Tribe* case, in most of the mine in this case, the coalbed methane is not owned by the coal owner.

*Id.* at 874–75, 119 S.Ct. 1719. The Supreme Court also deemed it important that, although Congress was well aware of its existence, CBM was considered a dangerous waste product which escaped from coal as the coal was mined and this was confirmed by the fact that coal companies venting the gas to prevent its accumulation in the mines made no attempt to capture or preserve it. The more gas that escaped from the coal once it was brought to the surface, the better it was for the mining companies because it decreased the risk of a dangerous gas build-up during transport and storage. *Id.* at 876, 119 S.Ct. 1719. While the relevant time frame for determining the intent of Congress in this regard was significantly earlier than applicable to the conveyance at issue in this case, no significant changes occurred in the 1909 through 1970 interim period relative to the general knowledge of the existence and value of coalbed methane. We can safely presume the parties to the warranty deed herein knew generally that methane existed in the coalbed, posed some safety problems although not as significant as those posed in underground mines, and was not viewed as having independent value.

[¶ 27] At bottom, our role is to give effect to the general intent of the parties to the conveyance with regard to the exploitation of the mineral resources. Rather than following some rigid rule of law, we believe this issue should be governed by the facts and circumstances surrounding the execution of this warranty deed. This approach is consistent with that taken by other courts and recognized by the commentators as the most practical one. Lewin, 94 W. Va. L.Rev., *supra* at 638.

[¶ 28] In the case before us, we know the purpose of the mining company's purchase of the property was to allow the development of a surface coal mining operation. On the other hand, the landowners were fully aware that their property had value for its gas development as they had previously leased their oil and gas interest and had received the benefit of royalty payments. Their purpose in executing the warranty deed was to realize additional value from the property through the sale of the surface and their limited coal rights. The general intent which can logically be ascribed to these parties is that the landowners would retain any oil and gas found within the property and the coal operator would be able to fully exploit the coal resource. Each of the parties involved in this situation—the landowners, the original gas lessee, the coalbed methane operator, and the coal owner—operated consistently with this intent. The landowners, acting as the owner of the gas resource, leased all the right to produce oil and gas on the property with no distinction as to depth or source of the gas. The original oil and gas lessee proceeded to drill and produce, without distinction as to depth or source, all oil and gas found in the conventional manner. Twenty years later, when coalbed methane production became commercially feasible, the coalbed methane operator obtained an assignment of the oil and gas lease from the surface to 1,000 feet beneath the surface, under the obvious assumption that the coalbed methane was covered by the lease. And, for over twenty years, the coal owner operated its surface mine, venting whatever gas existed within the coal as it was mined, without objection or interference. To conclude that the landowners intended to separate the coalbed methane and convey it along with their outstanding royalty interest through the language of "all coal and minerals commingled with [the] coal" is simply not plausible.

[¶ 29] The coal operator argues it intended to acquire all minerals that were commingled with the coal in order to eliminate the possibility of conflicts between the development of those minerals and its mining operation. While that would be a logical conclusion to be drawn in the abstract, the potential conflict with oil and gas development would certainly not be averted in this situation by the coal owner also owning the private coalbed methane in a relatively small area of the mine, as conventional oil and gas development already existed throughout the mine area and the coal operator did not own the federal coalbed methane which existed throughout the majority of the mine area. We also doubt conflicts with coalbed methane development *per se*, as distinct from other oil and gas development, were on the

coal owner's mind at the time of the warranty deed since commercial development of that resource did not exist in this area.

[¶ 30] The coal operator strenuously argues the broad language of the warranty deed, "coal and minerals commingled with [the] coal," was intended to allow it to release the coalbed methane during the mining operation without liability. However, as noted by the Supreme Court:

> The right to dissipate the CBM gas where reasonable and necessary to mine the coal does not, however, imply the ownership of the gas in the first instance. Rather, it simply reflects the established common-law right of the owner of one mineral estate to use, and even damage, a neighboring estate as necessary and reasonable to the extraction of his own minerals.

*Southern Ute Indian Tribe,* 526 U.S. at 879, 119 S.Ct. 1719 (citing *Williams v. Gibson,* 84 Ala. 228, 4 So. 350 (1888); Rocky Mountain Mineral Law Foundation, 6 American Law of Mining § 200.04 (2d ed.1997)). Other courts which have considered this issue agree the right to ventilate gas, which is an essential element of the right to mine, is not equivalent to ownership. *NCNB Texas National Bank, N.A.,* 631 So.2d at 226. No one questions the coal owner's right to ventilate coalbed methane in the course of mining. "The grant of coal mining rights would be useless if it did not include the right to ventilate methane gas from the coal mining area." *Id.* at 228.

[¶ 31] While we recognize that separate ownership of coal and coalbed methane may result in conflicts, we agree with the United States Supreme Court when it noted "[t]hat is not the issue before us, however. The question is one of ownership, not of damage or injury," *Southern Ute Indian Tribe,* 526 U.S. at 879, 119 S.Ct. 1719, and the Alabama Supreme Court which stated, "The question before us is who owns the rights to coalbed methane gas . . . and not who should own those rights." *NCNB Texas National Bank, N.A.,* 631 So.2d at 227. Conflicts between owners of different mineral estates are relatively common in the history of mineral development and are typically resolved through normal business negotiation and, if neces-

sary, litigation. The surface use licenses and agreements for coalbed methane entered into between RAG and Hi–Pro clearly demonstrate that fact. In exchange for access and other mutually beneficial promises, Hi–Pro agreed to numerous steps to avoid interference with RAG's mining operation and to subordinate its rights to RAG's. In addition, Hi–Pro agreed RAG would not be liable for damages or loss of production on adjacent lands operated by Hi Pro as a result of RAG's mining operations. While the terms of this agreement were no doubt dependent on the respective negotiating positions of the parties, it demonstrates the potential for accommodation and the improbability of negative impacts on the development of either resource from different ownerships of coal and coalbed methane. In addition, the potential for conflicts between oil and gas development and coal mining exists in this situation irrespective of whether the gas owner also owns the coalbed methane as gas produced by conventional methods is separately owned.

### CONCLUSION

[¶ 32] On the basis of the unambiguous language of the deed and the surrounding facts and circumstances, we conclude the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property. By this ruling, we do not intend to imply that, in all circumstances, the conveyance of coal excludes the conveyance of the coalbed methane. Parties can certainly sever the coalbed methane from the remainder of the oil and gas estate and convey it separately. Such an explicit severance occurred in this case when the oil and gas lessee vertically segregated its oil and gas leasehold interest and assigned from the surface to 1,000 feet beneath the surface, which contained the coal seam, to Hi–Pro. However, the warranty deed from the landowners to the coal operator in this case, which conveyed "all coal and minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal operations"

but reserved all oil and gas, did not accomplish such a segregation.

[¶ 33]   Reversed.