2018 WY 2

BERENERGY CORPORATION,
Appellant (Plaintiff),

v.

BTU WESTERN RESOURCES, INC.;
School Creek Coal Resources, LLC; and
Peabody Powder River Mining, LLC,
Appellees (Defendants).

BTU Western Resources, Inc.; School
Creek Coal Resources, LLC; and Pea-
body Powder River Mining, LLC, Appel-
lants (Defendants),

v.

Berenergy Corporation, Appellee
(Plaintiff).

S-17-0040
S-17-0041

Supreme Court of Wyoming.

January 4, 2018

Rehearing Granted February 6, 2018

Representing Berenergy Corporation: Pe-
ter C. Forbes of Carver Schwarz McNab
Kamper & Forbes, LLC, Denver, Colorado;
Darin B. Scheer and Blake A. Klinker of
Crowley Fleck PLLP, Cheyenne, Wyoming.
Argument by Mr. Forbes.

Representing BTU Western Resources, Inc.; School Creek Coal Resources, LLC; and Peabody Powder River Mining, LLC: Patrick R. Day, P.C.; Thomas L. Sansonetti, P.C.; Matt J. Micheli, P.C.; Jeffrey S. Pope, Holland & Hart LLP, Cheyenne, Wyoming. Argument by Mr. Day.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

DAVIS, Justice.

[¶1] This case involves a dispute between mineral developers in Wyoming's Powder River Basin. Berenergy Corporation produces oil from several sites under three oil and gas leases granted by the United States Department of the Interior, Bureau of Land Management (BLM). The surface area covered by those leases and wells overlaps lands that, pursuant to BLM coal leases, affiliates of Peabody Energy Corporation (Peabody) are planning to strip-mine.

[¶2] Berenergy's suit eventually led to cross-motions for summary judgment, the district court's April 1, 2015 "*Order Granting in Part and Denying in Part Plaintiff's Motions for Summary Judgment and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment,*" and the court's October 13, 2016 "*Order Declaring Rights Pursuant to the Court's Summary Judgment Order Dated April 1, 2015, and Granting Incidental Relief to Enforce Declaration.*" Berenergy appealed the aspects of those orders that essentially required it, at the appropriate times, to cease production and cap its wells below the projected coal seam, so that Peabody could "mine through" the affected areas. Peabody cross-appealed the aspects that required it to place over $13,000,000 in escrow to cover Berenergy's additional costs, if it was in the future granted permission by the Wyoming Oil and Gas Conservation Commission to directionally drill an offsite well for enhanced water-flood production of the oil to which it was entitled.

[¶3] We remand the case with directions for further proceedings before the district court, despite our belief that the case will most likely have to be dismissed.

### ISSUE

[¶4] Considering our disposition of this case, we reduce Berenergy's several intertwined issues into a single issue:

Does this case present a justiciable issue when this Court cannot render a decision binding on a federal agency, and can only offer an advisory opinion which may or may not ultimately bind the parties?

Our resolution of that question makes it unnecessary to address any issues relating to the monetary aspects of the district court's challenged orders.

### FACTS

[¶5] This case involves complex facts and issues, but given the relatively narrow question we address, we will limit our statement of the facts to those pertinent to answering it. On May 6, 2014, Berenergy filed a complaint for a declaratory judgment that the terms of its earlier-granted BLM oil leases provided it with rights superior to any obtained by Peabody through its later coal leases. It alleged that its superior rights precluded Peabody from forcing it to shut down its wells for fifteen to twenty years, with no compensation, while Peabody mined through the areas containing or immediately adjacent to those wells. It sought declarations to that effect, and to prevent Peabody from conducting its mining operations in such a fashion as to interfere with Berenergy's operations, including its plan to increase production by water-flooding the oil-bearing formations covered by its leases.[1]

[¶6] On June 19, 2014, the case was removed to the United States District Court for the District of Wyoming and effectively joined with a suit previously filed by Peabody, which related to the same leases and raised similar questions. The cases were remanded to the state district court approxi-

---

1. Whether Berenergy could obtain Wyoming Oil and Gas Conservation Commission approval of such a plan, and its economic viability, were the subject of considerable disagreement. However, we need not leave the main issue we resolve to pursue that diversion.

mately a month later after the federal court dismissed them for lack of federal question jurisdiction.

[¶7] On October 24, 2014, Berenergy filed a motion for a partial summary judgment which largely reiterated the points in its complaint. It also clarified that its primary claim was intended to sound in contract, that it rested on the effective dates and the allegedly unambiguous language of its BLM leases, and that nothing in the Mineral Leasing Act of 1920 (MLA) or the regulations issued under the Act diminished the superior right it enjoyed over Peabody by virtue of that language.[2]

[¶8] On the other hand, Peabody took the position that the clear and unambiguous language of the oil leases expressly required Berenergy to give "due regard" to coal development, to operate its wells in such a manner as to cause "minimal adverse effect on ultimate recovery" of coal, and in cases of disagreement with coal lessees, to submit the matter to the state district court. It argued that the court was to craft a plan that would maximize production of both minerals while minimizing harm to both parties, and to award compensation for any imbalance in the damages a party might suffer as a result of implementing the plan.

[¶9] In ruling on the parties' cross-motions for partial summary judgments, the district court determined that the language of Berenergy's leases was unambiguous. However, it concluded that the intent of the parties to those leases, Berenergy and the BLM, could be divined only by reading their provisions in conjunction with Peabody's coal leases and general policy aims articulated in the MLA and the federal rules and regulations promulgated to give effect to that Act. Those extrinsic sources, the court determined, implicitly allowed Peabody to block Berenergy from producing oil—or Berenergy to block Peabody's coal production—so long as the restriction was reasonable. Because the

question of reasonableness required factual development, the court denied the portions of both parties' summary judgment motions seeking to unconditionally block or permit Peabody's interference with Berenergy's interests.

[¶10] Following trial, the district court derived its analysis of what was reasonable from Wyoming rules governing the review of State mineral lease conflicts by the Director of the Office of State Lands.[3] It decided that if the parties could concurrently produce without materially reducing the quantity or value of the oil and coal produced, it had to determine whether Berenergy's operational costs would nevertheless be increased significantly, and whether Peabody can pay those costs without unreasonably burdening its operations. From those determinations, the court would develop a plan for concurrent operations and assess damages.

[¶11] On the other hand, if the district court determined that concurrent production was impossible, it had to examine whether the value of Peabody's coal so exceeded the value of Berenergy's oil that both parties and the public would receive greater benefit from having Berenergy terminate its current operations, and having Peabody compensate it for its loss. That compensation must be equal to the value of the rights lost by Berenergy, as determined in the manner applicable to condemnation in eminent domain proceedings.

[¶12] Applying that standard, the district court concluded that concurrent production under Berenergy's proposals was not economically feasible, because it would unreasonably add more than $300,000,000 to Peabody's costs to mine the coal. It also determined that because the value of the coal to be mined vastly exceeded that of the oil that could be recovered from Berenergy's existing production from its relatively old wells, those wells should be shut down, and that Peabody should compensate

---

2. During the course of proceedings before the district court, Peabody filed for reorganization in the United States Bankruptcy Court for the Eastern District of Missouri. That court partially lifted the automatic stay of 11 U.S.C. § 362 to permit the district court and this Court to issue rulings on the issues described above. We are unaware of any decision by the bankruptcy court that bears on the specific question we address in this opinion.

3. Wyo. Admin. Code, LAND LC, Ch.18, § 18(d); Ch. 19, § 18(d).

it $878,021 for doing so. In addition to being compensated for long-term loss of its primary production wells, Berenergy could also be compensated $13,051,084 for increases in the cost of secondary water-flooding operations on its existing wells from a new well outside the area to be mined, if such operations were approved by Wyoming authorities. The latter amount was to be escrowed with the district court to assure that it was available if the flooding plan was approved.

[¶13] Before engaging in this discussion, however, the district court presciently expressed concern over an aspect of this case that we likewise find troubling:

> The second curious aspect of this case is that despite all of the leases at issue being Federal leases, the BLM has not been brought in as a party to this case nor has it sought to intervene. To the contrary, the BLM seems content to allow a state court to determine how coal and oil and gas development will proceed on Federal lands. As the Court noted in its summary judgment order, the Court believes this is largely a political issue, which the BLM is tasked with answering. This is especially true since the Secretary of Interior, the administrative head of the BLM, is the "statutory guardian" of the public's interest in minerals. This Court is not aware of another situation wherein a federal agency has been so willing *not* to dictate to the State's [sic] how things will be done. Political issues can be thorny, but in this case the political issue of who should go first (oil and gas or coal) when concurrent mineral development on Federal lands may not be possible, seems to be a thorny issue that the BLM should be answering. As Winston Churchill said, "The price of greatness is responsibility."
>
> The absence of the BLM, and its refusal to act in light of clear statutory authority (or duty) to do so is even more troubling in light of the BLM's duty to ensure that the people's resources, i.e., minerals, are "extract[ed] in accord with prudent principles of conservation." *California Co. v. Udall*, 296 F.2d 385 [384], 388 (D.C. Cir. 1961). Berenergy, rightfully so, is only interested

in the financial impact allowing coal development may have on its bottom line. Likewise, and rightfully so, Peabody's only interest is in its financial bottom-line. The entity charged with protecting the *public's interest* has decided to sit this one out.

*Order Declaring Rights Pursuant to the Court's Summary Judgment Order Dated April 1, 2015, and Granting Incidental Relief to Enforce Declaration* (emphasis and alteration to quotation in original).

[¶14] Berenergy appealed the district court's order allowing Peabody to "mine through," and Peabody appealed the portion of the order requiring it to escrow the approximately $13,000,000 in anticipation of the possible enhanced recovery flood operation Berenergy claimed would enhance production and revenue from its wells.

## DISCUSSION

**Interpretation of Mineral Leases**

[¶15] This Court applies general principles of contract interpretation when analyzing the parties' intent with respect to mineral leases. If, as the district court found in this case, the language of a lease is unambiguous, it controls our determination of intent, and we will give it the meaning it would convey to a reasonable person at the time and place the instrument was drafted as a matter of law. *Sutherland v. Meridian Granite Co.*, 2012 WY 53, ¶ 8, 273 P.3d 1092, 1095 (Wyo. 2012); *Newman v. RAG Wyoming Land Co.*, 2002 WY 132, ¶ 12, 53 P.3d 540, 544 (Wyo. 2002).

[¶16] When the language is unambiguous, we confine ourselves to the four corners of the lease, and we consider extrinsic evidence only to the extent it does not alter or add to the terms of the instrument, but merely sheds light on its context. *Horse Creek Conservation Dist. v. State ex rel. Wyoming Attorney General*, 2009 WY 143, ¶ 25, 221 P.3d 306, 315 (Wyo. 2009); *Fox v. Wheeler Electric, Inc.*, 2007 WY 171, ¶ 10, 169 P.3d 875, 878 (Wyo. 2007); *see also Sutherland*, ¶ 8, 273 P.3d at 1095. Here that context consists entirely of provisions of the Mineral Leasing Act of 1920, 30 U.S.C.

§§ 181-287, and provisions of regulations promulgated under the Act.

### The MLA

[¶17] After 1909, the federal government shifted away from a "location" system of allocating production from petroleum on its lands. Under the old system, prospectors would appropriate petroleum by marking and registering portions of public lands for exploration. Upon discovery and production of petroleum, they could receive a form of title by patent from the government. In 1920, Congress shifted to the leasing system of the MLA. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 789-90 (D.C. Cir. 1983); 4 *Pub. Nat. Resources L.* § 39:2 (2nd ed. October 2017 update).

[¶18] Although Congress patterned the new leasing system after private oil and gas lease transactions to some extent, it differs from that model in several significant respects. For example, prospective federal lessees typically are not free to negotiate lease terms and covenants, particularly those which may be set by law, and the government may often unilaterally modify provisions, such as by relieving a lessee of a production requirement when decreasing market prices threaten the viability of its operations. Perhaps most importantly, the Secretary of the Interior has been accorded—both congressionally and judicially—broad discretionary authority over not only the imposition of lease terms and conditions, but over the allocation and management process as a whole. *Id.* §§ 39:1, 39:2, 39:4.

[¶19] In 1976, amendments to the MLA also brought federal coal leases under its purview, in no small part because speculators routinely held Western coal leases without complying with the requirement that they be developed and placed into production. In 1970, 91% of existing BLM coal leases were not producing. Consequently, the amendments allowed the Secretary and the BLM to broadly "readjust" the terms of pre-existing coal leases at the end of their 20-year terms to achieve proper administration of public lands. Under 30 U.S.C. § 207, those readjustments can extend to all lease terms and conditions, and may subject a lessee to rules and regulations adopted after the granting or renewal of his lease. *Id.* §§ 38:1, 38:8, 38:14.[4]

[¶20] The powers of the Interior Department and the BLM are not unlimited, however. In drafting the MLA, Congress provided no guidance as to how the agencies were to allocate the relative rights and privileges of lessees of two minerals in a single tract, or how to prioritize conflicting operational needs. BLM regulations also largely fail to clarify this issue, except to note in 43 C.F.R. § 3000.7 that granting a lease to recover one mineral did not preclude the agency, so long as it devised a suitable stipulation for simultaneous operations, from granting a lease for another mineral on the same land. *Id.* § 41:8. Conditioning the power to grant the second lease upon the existence of such a stipulation and its attachment to the second lease appears consistent with the notion that the acts of the Secretary are to some extent subject to valid existing rights created by a prior lease. *Penroc Oil Corp. et al.*, 84 IBLA 36, 40-41, 43 (1984) (citing 43 U.S.C. § 1701, which provides that once the Secretary issues a lease, he may not deny or extinguish that lessee's right under the terms of the lease to use as much of the surface estate as necessary to continue production using an established well); *see also Coastal Oil, supra* (cited in n.4).

[¶21] That limitation is certainly enforceable against the Secretary. In *Bill Barrett Corp. v. U.S. Dept. of Interior*, 601 F.Supp.2d 331 (D.D.C. 2009), a mining company applied for a license to explore for coal in the Powder River Basin on BLM land other than that land covered by its lease. On neighboring land, coal bed methane was being produced under several federal leases. The producer objected to that exploration because test

---

4. Since 1988, federal leases for all minerals have usually provided in their granting clauses that the rights being granted were subject to applicable laws and the rules and formal orders of the Secretary of the Interior that were in effect at the time the lease was issued, as well as any later-issued rules and formal orders **that were not inconsistent with express specific provisions of the lease.** 12 *E. Min. L. Found.* § 18.02 (1991); *Coastal Oil and Gas Corp. et al.*, 108 IBLA 62, 65-66 (1989).

drilling for coal would contaminate its gas stream by introducing oxygen into the formation, requiring costly production shutdowns and purging of contamination from the otherwise marketable gas. *Id.* at 333.

[¶22] The BLM determined the risk to gas production was too uncertain to stop the mining company's exploration altogether. On review, the United States District Court concluded in part that the gas producer was not entitled to the essentially equitable remedy of stopping exploration, because it had a compensatory legal remedy available to it. That is, it could sue the federal government in the Court of Federal Claims under a contract or taking theory for unreasonably interfering with the terms of its BLM gas lease. *Id.* at 333-36.

[¶23] Aside from pursuing such an action, or pursuing an administrative case and then federal court review of a BLM decision as in *Bill Barrett,* few avenues to enforce the terms of its lease may be available to one in the parties' position. It has been noted that the relations between private parties who are lessees subject to the MLA generally may be determined according to the law of the state where the minerals are located. *See, e.g., Wallis v. Pan Am. Petroleum Corp.,* 384 U.S. 63, 69, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). However, it is also widely held that the MLA has created no implied right of action by one private party against another. No such right exists for federal mineral lessees absent clear evidence of Congressional intent. *Coosewoon v. Meridian Oil Co.,* 25 F.3d 920, 928-29 (10th Cir. 1994); *Arkla Exploration Co. v. Texas Oil and Gas Corp.,* 734 F.2d 347, 354 (8th Cir. 1984); *Naartex,* 722 F.2d at 789; *Pullman v. Chorney,* 712 F.2d 447, 449-50 (10th Cir. 1983).

[¶24] An additional barrier to relief exists when one private party's suit in effect seeks to condemn a portion of another private party's federal mineral leasehold. Because the government holds title to the minerals whose recovery the first party is seeking to curtail—to the public's potential detriment—the United States is an indispensable party that cannot be brought into a suit without its consent. *Transwestern Pipeline Co. v. Kerr-McGee Corp.,* 492 F.2d 878, 883 (10th Cir. 1974); *Stewart v. United States,* 242 F.2d 49, 51 (5th Cir. 1957) (holding more broadly that the United States is an indispensable party in any private suit challenging one's possessory interest in land, if that interest was obtained from the United States).

[¶25] The effect of the government's status in such cases is well-illustrated in *Leiter Minerals, Inc. v. United States,* 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). Leiter sued a federal mineral lessee in state court to have itself declared the owner of mineral rights associated with government owned surface lands. The lessee unsuccessfully urged that the suit could not be maintained because its lessor, the United States, was an indispensable party and had not consented to being sued. The United States then brought a federal court suit to quiet title in the disputed mineral rights, and to enjoin Leiter's state court action. The Supreme Court eventually approved of the issuance of an injunction, in part because Leiter's state suit against persons holding mineral rights under the authority of the United States was ultimately one in derogation of the United States' title to those minerals, and without making the government a party, the suit could not bind it to any allocation of the state parties' relative rights. *Id.* at 226-28, 77 S.Ct. 287.

**The Leases**

[¶26] Similar to what was noted above in note 4, the opening text in each of Berenergy's BLM lease documents recites that the BLM is offering to lease oil and gas reserves in property "pursuant and subject to the terms and provisions of the [MLA] ... and to all reasonable regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions" in the lease.

[¶27] In the body of all the leases, Section 2(j) in pertinent part obliges Berenergy:

To exercise reasonable diligence in drilling and producing the wells herein provided for **unless consent to suspend operations temporarily is granted by the lessor;** to

carry on all operations in accordance with approved methods and practice . . ., having due regard for the prevention of **waste of oil or gas** or **damage to . . . coal measures or other mineral deposits** . . .; to carry out at expense of the lessee **all reasonable orders of the lessor** relative to the matters in this paragraph . . . .

(Emphasis added.)

[¶28] In two of the three leases, Section 3(b) reserves to the BLM the right to "lease, sell, use, permit the use of or otherwise dispose of the surface or surface resources of any of the lands embraced within this lease, which are owned by the United States, **insofar as such use or disposition will not interfere with lease operations.**" (Emphasis added.) The identically designated paragraph in the third lease reserves to the government the right to similarly dispose of the surface of the leased lands "under existing law or laws hereafter enacted, **insofar as said surface is not necessary for the use of the lessee in the extraction and removal of the oil and gas therein**[.]" It also permits the BLM to dispose of any resources in those lands "**which will not unreasonably interfere with operations under this lease.**" (Emphasis added.)

[¶29] Section 5 of two leases and Section 4 of the third contains the parties' agreement that the Secretary enjoys the discretion, in service of the public interest, to control the quarterly rate of production pursuant to the lease.

[¶30] These provisions grant authority to manage federal minerals to the Secretary or his designees. They may create a right in Berenergy, enforceable against the Secretary, to maintain its production without unreasonable interference from subsequent lessees, so long as it does not waste oil or damage any coal deposits. However, the priority of Berenergy's interests over those of subsequent lessees, seemingly granted by its leases, is subject to pertinent administrative rules and regulations.

[¶31] The most pertinent of these is 43 C.F.R. § 3000.7, which provides in relevant part that the "granting of a permit or lease for the prospecting, development or production of deposits of any one mineral shall not preclude the issuance of other permits or leases for the same lands for deposits of other minerals **with suitable stipulations for simultaneous operation**[.]" (Emphasis added.) The effects of that rule are thoroughly addressed in an opinion letter directed on August 3, 1992 from the Interior Department's Office of the Solicitor to the BLM's state director in Wyoming.

[¶32] The author of that letter noted that the regulation adopts a "first in time, first in right" doctrine pursuant to which an earlier-issued mineral lease gives the associated lessee operating rights superior to those holding a later-issued lease. However, that priority can be altered by including in the second lease "suitable stipulations" that would make it possible for the second lessee to operate simultaneously with the first without unreasonably interfering with recovery of the first-leased mineral. If no stipulations capable of having that effect are in the second lease, the BLM should not issue that lease. If such a lease issues, the first lessee retains his superior right to operate.

[¶33] The Peabody leases all contain the following relevant stipulations at Section 15:

MULTIPLE MINERAL DEVELOPMENT—Operations will not be approved which, in the opinion of the Authorized Officer,[5] would unreasonably interfere with the orderly development and/or production from a valid existing mineral lease issued prior to this one for the same lands.

OIL AND GAS/COAL RESOURCES—The BLM realizes that coal mining operations conducted on Federal coal leases issued within producing oil and gas fields may interfere with the economic recovery of oil and gas; just as Federal oil and gas leases issued in a Federal coal lease area may inhibit coal recovery. BLM retains the authority to alter and/or modify the resource recovery and protection plans for

---

**5.** An "authorized officer" is any employee that the BLM has authorized to perform this duty. 43 C.F.R. § 3000.0-5(e).

coal operations and/or oil and gas operations on those lands covered by Federal mineral leases so as to obtain maximum resource recovery.

[¶34] We need not venture an opinion as to whether these provisions are sufficiently detailed or specific to constitute a proper stipulation under 43 C.F.R. § 3000.7. We do note, however, that they share much with the provisions of the Berenergy leases and the letter of legal advice from the Interior Department to a local BLM office. That is, like those documents, these provisions appear to place decision-making authority over the operational rights conveyed by leases to conflicting mineral rights squarely and solely in the hands of the Secretary of the Interior and his designees.

[¶35] Balancing of competing rights to mineral production in the public's interest is in part an intensely policy-driven matter committed to the Secretary. It would certainly be understandable if he or his designees chose to disregard the district court's decision—or ours—in this case. Federal resource policy is not our province. And with respect to Berenergy's suit to enforce its contract rights under its BLM leases, we must also consider how resolution of that issue can impact the Secretary as Berenergy's non-party lessor if he disagrees with it and concludes that Peabody may not mine through.

[¶36] We have generally declined to render judgments which cannot resolve issues as a matter of standing, observing that "[t]he controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion." *Leavitt v. State ex rel. Wyo. Dep't of Transp.*, 2017 WY 149, ¶ 7, 406 P.3d 1266, ¶ 7 (Wyo. 2017) (citing *William F. West Ranch, LLC v. Tyrrell*, 2009 WY 62, ¶ 12, 206 P.3d 722, 727 (Wyo. 2009); *Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo. 1974)). We have made it clear that we will not offer advisory opinions, which appears to be what is sought in light of the Secretary's authority to disregard it and make a different decision. *Powder River Basin Res. Council v. Wyoming Oil & Gas Conservation Comm'n*, 2014 WY 37, ¶ 35 n.7, 320 P.3d 222, 232 n.7 (Wyo. 2014) (citing *State Bd. of Equalization v. Jackson Hole Ski Corp.*, 745 P.2d 58, 59 (Wyo. 1987)).

[¶37] The situation also creates an issue with our rule on joinder of indispensable parties. In relevant part, W.R.C.P. 19 provides:

(a) *Persons Required to Be Joined if Feasible.—*

(1) *Required Party.—*A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; . . .

\* \* \*

(2) *Joinder by Court Order.—*If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

\* \* \*

(b) *When Joinder Is Not Feasible.—*If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, **the action should proceed among the existing parties or should be dismissed.**

(Emphasis added.)

[¶38] There does not seem to be any way the Secretary, his designees, or the agencies involved (the Department of the Interior and the Bureau of Land Management) could ever be made a party to these proceedings unless it could somehow choose to be one. As already noted, the United States may not be sued without its consent. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); 14 Charles Alan Wright et al., *Federal Practice and Procedure, Jurisdiction* § 3654 (4th ed. April 2017 update) ("It has been settled since the mid-nineteenth

century that the United States may not be sued without its consent."). This limitation applies to actions against federal agencies and officers in state court. *Id.* § 3655 ("Restrictions on suits against the United States cannot be circumvented by instituting the action against a federal agency or officer in state court."). Generally, only Congress can waive the United States' right to assert the defense of sovereign immunity, although there are exceptions. *Id.* § 3654. We are thus in a position where we cannot render a truly binding judgment without the participation of the United States, and an agency of the United States probably cannot be joined.

[¶39] Finally, we note that restraint is in order. As already noted, allowing Peabody to buy out Berenergy's leases is akin to granting it a right of condemnation. No constitutional provision or statute cedes authority to Wyoming courts to do that.[6] We are reluctant to create such a right judicially, especially when the right to adjust those leases has been entrusted under existing law to the Secretary of the Interior.

[¶40] Although it seems clear to us that the Secretary of the Interior or his designees cannot be joined in this action to obtain a determination of the parties' rights, scholarly authorities point to exceptions to the sovereign immunity rule. *Id.* § 3656. While none of them appear to apply to this case (which probably explains why no attempt to join any federal agency has been made), we do not have briefing on that issue, and will therefore remand to allow the district court to consider that point if the parties wish to address it. Failing a showing that somehow the Secretary of the Interior or other federal agency can be joined as a party, the district court will be directed to vacate its previous judgment and dismiss.

[¶41] We understand the vital importance of this issue to Berenergy, Peabody, and Campbell County. Berenergy seeks to protect its right to produce oil and gas, a right it has even though those wells are apparently near depletion, and even though Peabody accuses it of attempting to extort an unreasonable buyout. On the other hand, if Peabody could mine through to produce the coal in question, it would preserve and/or create many jobs and generate substantial tax revenue. Nonetheless, the state courts are not the proper forum to settle the rights of these federal lessees for reasons already stated, at least without federal participation, which seems impossible. Whether a remedy can be found in federal administrative proceedings, the Court of Claims or other federal courts, or in seeking action by the United States Congress, we cannot surmise. Perhaps the Bureau of Land Management, as the district court aptly put it, will decide not to "sit this one out" after all.

## CONCLUSION

[¶42] The language of the leases involved in this case, as well as the statutory and regulatory schemes under which they were granted, persuades this Court that Congress intended that the issues raised by Berenergy be decided by the Secretary of the Interior or its BLM designees, not the courts in Wyoming. Moreover, the portions of those sources to which this Court has been directed reveal no express consent by the federal government for the Secretary or the BLM to be made a party to suits such as this for the purpose of informing a congressionally approved decision by the district court. Nor do they reveal any delegation of authority to those agencies to give such consent.

---

**6.** The parties have both referred us to *Chartiers Block Coal Co. v. Mellon,* 152 Pa. 286, 25 A. 597 (1893), as authority for and against the notion that a Wyoming court can decide a conflict between lessees on the same parcel of land. In that case, a private surface owner had sold coal in a certain stratum, and then granted a lease for oil and gas exploration. The coal company sought to enjoin drilling. The trial court refused to grant an injunction as requested, but did enjoin wells which would pass through the coal vein and post a bond in addition to the injunction bond. The Pennsylvania Supreme Court declined to disturb the decree of the lower court after considerable discussion of the need for accommodation of the right to access the minerals involved, and the right to have a jury assess the damages resulting from this accommodation. Whatever else may be said of this case, it did not deal with federal leases subject to the law, regulations, and lease provisions we find here, and it is of little guidance for that reason.

[¶43] However, out of an abundance of caution, we remand for an evaluation of whether a federal agency may participate in this suit. If it cannot be made a party or does not choose to participate, which is very likely, the district court must dismiss the case.