# THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 116A

OCTOBER TERM, A.D. 2022

October 26, 2022

| | |
|---|---|
| NORTH SILO RESOURCES, LLC, a Delaware limited liability company, <br><br> Appellant <br>(Plaintiff), <br><br> v. <br><br> KIRSTIN J. DESELMS; SINGLETREE LAND, LLC, a Wyoming limited liability company; HUGH DESELMS; PAUL A. WOODS; CHERYL S. WOODS; SHELLI R. WOODS; CODY S. WOODS; CHARLOTTE JOAN HUTTON; HUTTON FAMILY PARTNERSHIP; MIKE HUTTON and HUTTON MINERALS, LLC, a Wyoming limited liability company, <br><br> Appellees <br>(Defendants). | S-21-0267, S-21-0291 |

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell Judge*

*Representing North Silo Resources, LLC:*

Warren W. Harris and Stephani A. Michel, Bracewell LLP, Houston, Texas; Anthony T. Wendtland, Wendtland & Wendtland LLP, Sheridan, Wyoming; William E. Sparks and Nicol T. Kramer, Beatty & Wozniak, P.C., Denver, Colorado, and Casper, Wyoming. Argument by Mr. Wendtland.

*Representing Kirstin J. Deselms; Singletree Land, LLC; and Hugh Deselms:*
Kristopher C. Koski and Justin A. Daraie, Long Reimer Winegar LLP, Cheyenne, Wyoming. Argument by Mr. Daraie.

*Representing Paul A. Woods and Cheryl S. Woods:*
Alexander K. Davison and Patrick D. Kent, Patton & Davison LLC, Cheyenne, Wyoming. Argument by Mr. Kent.

*Representing Shelli R. Woods and Cody S. Woods:*
No appearance.

*Representing Charlotte Joan Hutton; Hutton Family Partnership; Mike Hutton; and Hutton Minerals, LLC:*
J. Mark Stewart, Davis & Cannon, LLP, Cheyenne, Wyoming. Argument by Mr. Stewart.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**[1]

[¶1]     This case arises from a dispute over mineral ownership and the corresponding rights of a mineral lessee.  Appellant North Silo Resources, LLC (North Silo), the mineral lessee, sought a declaratory judgment and to quiet title in certain minerals underlying property in Laramie County, Wyoming.  It also asserted a claim for breach of lease against the mineral owner.  The district court held that North Silo did not have standing to quiet title or to claim breach of its lease and that its mineral lease encumbers only 50% of the mineral estate.  North Silo appeals.  We find North Silo's lease encumbers 100% of the mineral estate.  North Silo had standing to quiet title and standing to assert a claim for breach of lease.  We reverse and remand.

## ISSUES

[¶2]     While the parties present varying issue statements, the dispositive issues are:

1. What minerals are encumbered by North Silo's mineral lease?

2. Does North Silo have standing to assert a claim seeking to quiet title to its leasehold and for breach of lease?

## FACTS

### Initial Conveyances to the Huttons and the Woods

[¶3]     In 1987, C Bar J Ranches, Inc. (C Bar J) owned 100% of the surface and minerals of property located in Laramie County, Wyoming (Property).[2]  On May 7, 1987, C Bar J sold the Property to William R. Hutton and Charlotte J. Hutton (the Huttons) and provided them a warranty deed (the C Bar J-Hutton Deed).  The C Bar J-Hutton Deed conveyed the Property and one-half of the existing mineral rights.  It reserved "One-Half of the existing mineral rights for 20 years" and provided that "At the end of the 20 years, the mineral rights are to become the property of the purchasers."

---

[1] The opinion published in *N. Silo Res., LLC v. Deselms*, 2022 WY 116, 517 P.3d 556 (Wyo. 2022), published September 22, 2022, is amended by this opinion.  The earlier opinion has no further force or effect.  The amendments are to ¶ 59.

[2] The Property is described as:
>                 Township 17 North, Range 64 West of the 6th P.M. Laramie County,
>                 Wyoming:
>                 Section 25: All
>                 Section 35: All, Except Right of Way for U.S. Highway 85.

1

[¶4]   On April 27, 1992 (before C Bar J's twenty-year reserved mineral interest terminated), the Huttons sold the Property to the Woods defendants by a contract for deed (Woods Contract for Deed).  The Woods Contract for Deed was memorialized in a memorandum of sale recorded in April 1992.  A warranty deed conveying the Property to the Woods (the Hutton-Woods Deed) was held in escrow pending the Woods' performance of their obligations under the contract for deed.  In the Hutton-Woods Deed, the Huttons granted the Woods "all rights" to the Property, but reserved a life estate in all minerals owned by the Huttons and the right to develop those minerals during their lifetime:

> [The Huttons] reserve to [themselves] for the period of their lives, all minerals, including oil and gas they may own, that may be on, in, under or produced from the above described land.
>
> [The Huttons and the Huttons'] assigns shall, during their lives, have the exclusive right and privilege of making, executing and delivering leases of the land for the extraction or production of minerals.  On termination of this reservation, the interest reserved shall be owned by [the Woods and the Woods'] heirs and assigns.

In 2008, the Woods fulfilled the terms of the Woods Contract for Deed and recorded the Hutton-Woods Deed.

**Subsequent Conveyances by the Woods**

[¶5]   Also in 2008, the Woods entered into two separate contracts for deed, one with Kirstin Deselms and one with Hugh Deselms (collectively, the Woods-Deselms Contracts for Deed).  By these deeds, the Woods conveyed the Property and "one-half of the oil, gas, and other minerals" the Woods "now owned" or would "later acquire[]" and reserved the other half for their lives and their children's lives.  The Woods-Deselms Contracts for Deed provided:

> Buyer acknowledges and agrees that all mineral rights associated with the Property were previously reserved by William and Joanne [Charlotte] Hutton for their joint lifetimes, and that it cannot be determined with certainty when Sellers will acquire clear title to the mineral rights associated with the Property.

Kirstin Deselms and Hugh Deselms completed their obligations under the Woods-Deselms Contracts for Deed and recorded warranty deeds in 2013 (the Woods-Deselms Deeds).  In 2015, Kirstin Deselms conveyed her interest in the Property to Singletree Land, LLC.

**Subsequent Conveyances by the Huttons**

[¶6]    In November 1994, the Huttons quitclaimed "all rights, title, any interest owned, claimed, or held . . . in and to the mineral rights and interest in and to real property" to The Hutton Family Partnership.  In October 2016, The Hutton Family Partnership quitclaimed "all of its interest in and to all the oil, gas and other minerals in and under and that may be produced" from the Property to Hutton Minerals, LLC.  We refer to the Huttons, The Hutton Family Partnership, and Hutton Minerals, LLC, as "the Huttons" unless context requires a distinction to be made.

[¶7]    In 2010, after C Bar J's twenty-year reserved mineral interest terminated, the Huttons leased "all of" their oil and gas mineral interests under the Property to Cirque Resources (Cirque).  The lease provided Cirque an option to extend.  Cirque exercised its option in 2015.  Through a series of assignments in 2018 and 2019, North Silo acquired Cirque's interests under the lease and is the current mineral lessee.

**The Dispute and the District Court's Rulings**

[¶8]    The parties dispute the mineral ownership created by the outlined conveyances.

[¶9]    North Silo asserts that the 1987 C Bar J-Hutton Deed transferred one-half of the minerals to the Huttons outright, and one-half of the minerals to the Huttons as a vested remainder subject to C Bar J's twenty-year reservation.  Therefore, the Huttons own a life estate in 100% of the minerals and the corresponding executory rights.  These interests are measured by the lives of William R. Hutton and Charlotte J. Hutton.  Accordingly, North Silo argues that its mineral lease encumbers 100% of the minerals.

[¶10]  The remaining parties interpret the transactions differently.  They assert the minerals reserved by C Bar J were unvested, and that they did not vest in the Huttons in 1987, and had not vested when the Huttons sold the property to the Woods in 1992.  The Huttons' reservation of a life estate in "all minerals, including oil and gas they may own, that may be on, in, under or produced from" the Property was limited to the minerals conveyed and did not include the minerals reserved by C Bar J.  The reserved, unvested minerals transferred to the Woods when the twenty-year contingency expired.  They assign mineral ownership as follows:

- The Hutton Family Partnership owns a life estate in 50% of the minerals, measured by the lives of William R. Hutton and Charlotte J. Hutton;

- The Woods received the 50% C Bar J remainder and subsequently sold half of this interest and half of their future interest in the Huttons' 50% of the minerals to the Deselms.  They own a present life estate in 25% of the minerals obtained when the C Bar J reservation expired—measured by the lives of the Woods and their

3

children—and they own a life estate in a future interest in 25% of the minerals reserved by the Huttons;

- <u>Singletree Land, LLC, and Hugh Deselms</u> own a present interest in 25% of the minerals, a future interest in 25% of the minerals reserved by the Huttons, and a future interest in the remaining minerals reserved by the Woods in the Woods-Deselms Deeds.

From this position, these parties assert that North Silo's lease encumbers only 50% of the minerals—those minerals subject to the Hutton life estate. In August 2019, the Huttons, Woods, Deselms, and Singletree executed a "Stipulation of Interests and Cross-Conveyance" (the Stipulation) stipulating to the apportionment of mineral ownership set forth above. They filed the Stipulation with the county clerk.[3]

[¶11]   North Silo filed this lawsuit, seeking a declaration as to the percent of the mineral estate encumbered by its lease. It asserted claims for quiet title to its mineral lease, slander of title, bona fide purchaser of the mineral lease, and breach of the lease. The defendants filed motions to dismiss, which the district court largely granted. It dismissed North Silo's claims for slander of title and bona fide purchaser. Concluding that North Silo had no standing to quiet title or to claim breach of its lease, it also dismissed North Silo's claims to quiet title and for breach of lease. The district court allowed North Silo to proceed with its declaratory judgment claim.

[¶12]   The Woods, Singletree Land, LLC, and Hutton Minerals, LLC, filed counterclaims. Following discovery, all parties filed motions for summary judgment. The summary judgment motions focused on North Silo's claim for a declaration determining the mineral ownership percentages encumbered by its lease. The district court found that the defendants had "stipulated to the exact meaning and intent of the entire record title" and concluded that the Huttons owned only 50% of the minerals and North Silo's lease covered "only . . . Hutton Minerals 50% mineral interest in the Property measured by the life estate of Charlotte J. Hutton."[4] North Silo appeals.

## DISCUSSION

### I.      *What minerals are encumbered by North Silo's mineral lease?*

---

[3] This stipulation is discussed in more detail, *infra* at ¶¶ 17–20.

[4] The district court issued a pretrial decision letter in which it effectively dismissed the Woods, Deselms, and Singletree Land, LLC, Wyoming Royalty Payment Act (WRPA) counterclaims. The remaining claims were the Huttons' counterclaims for violations of the WRPA and the other defendants' counterclaims for conversion, accountings, and breaches of the surface use and access agreement. The court held a three-day bench trial and found against North Silo on most of these claims. North Silo appealed. It subsequently appealed the district court's attorney's fees and costs orders. Those appeals have been consolidated here.

## A. Standard of Review

[¶13]  W.R.C.P. 56(a) governs summary judgments:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

"We review a district court's order granting summary judgment *de novo* and afford no deference to the district court's ruling.  This Court reviews the same materials and uses the same legal standard as the district court."  *Bd. of Trs. of Laramie Cnty. v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 2020 WY 41, ¶ 6, 460 P.3d 251, 254 (Wyo. 2020) (citations omitted) (quoting *Est. of Weeks by & through Rehm v. Weeks-Rohner*, 2018 WY 112, ¶ 15, 427 P.3d 729, 734 (Wyo. 2018)); *Int'l Ass'n of Firefighters Loc. Union No. 279 v. City of Cheyenne*, 2013 WY 157, ¶ 8, 316 P.3d 1162, 1165 (Wyo. 2013).

## B. Interpretation of Deed and Lease Terms

[¶14]  When we interpret contracts, our goal is to determine the intent of the parties to the document.  *BNSF Ry. Co. v. Box Creek Min. Ltd. P'ship*, 2018 WY 67, ¶ 19, 420 P.3d 161, 166 (Wyo. 2018).  Deeds and mineral leases are contracts, and we apply our typical contract interpretation principles to them.  *Ecosystem Res., L.C. v. Broadbent Land & Res., LLC*, 2012 WY 49, ¶ 12, 275 P.3d 413, 417 (Wyo. 2012); *Sutherland v. Meridian Granite Co.*, 2012 WY 53, ¶ 8, 273 P.3d 1092, 1095 (Wyo. 2012).  As with all contracts, in construing deeds affecting mineral interests, this Court focuses "on the general intent of the parties, concentrating on the purpose of the grant in terms of the respective manner of enjoyment of surface and mineral estates and the exploitation of the mineral resources involved."  *Caballo Coal Co. v. Fid. Expl. & Prod. Co.*, 2004 WY 6, ¶ 11, 84 P.3d 311, 315 (Wyo. 2004) (citations omitted).

[¶15]  We begin by looking at the document itself and the "specific language" of the document.  *BNSF*, ¶ 19, 420 P.3d at 166 (quoting *Gilstrap v. June Eisele Warren Tr.*, 2005 WY 21, ¶ 12, 106 P.3d 858, 862 (Wyo. 2005)).  We give words "their plain and ordinary meaning.  Plain meaning is that meaning which the language would convey to reasonable persons at the time and place of its use."  *BNSF*, ¶ 20, 420 P.3d at 166 (quoting *Gilstrap*, ¶ 12, 106 P.3d at 862); *see also Caballo*, ¶ 11, 84 P.3d at 315 (in construing mineral deeds, the Court applies a "historical context analysis" to the words used in the deed).

> If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement

as they are expressed within the four corners of the contract. Common sense and good faith are leading precepts of contract construction, and the interpretation and construction of contracts is a matter of law for the courts. We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made.

*Wadi Petroleum, Inc. v. Ultra Res., Inc.*, 2003 WY 41, ¶ 11, 65 P.3d 703, 708 (Wyo. 2003) (citations omitted) (quoting *Williams Gas Processing--Wamsutter Co. v. Union Pac. Res. Co.*, 2001 WY 57, ¶ 12, 25 P.3d 1064, 1071 (Wyo. 2001)) (citing *Boley v. Greenough*, 2001 WY 47, ¶ 11, 22 P.3d 854, 858 (Wyo. 2001); *Newman v. RAG Wyoming Land Co.*, 2002 WY 132, ¶¶ 11–12, 53 P.3d 540, 544 (Wyo. 2002)). *See also Ecosystem*, ¶ 12, 275 P.3d at 417–18 (In construing an unambiguous contract, we may "examine evidence of the circumstances surrounding the execution of the deed to arrive at the parties' intent. Relevant considerations may include the relationship of the parties, the subject matter of the contract, and the parties' purpose in making the contract." (citations omitted)).

[¶16] "However, if the meaning of a contract is ambiguous or not apparent, it may be necessary to use evidence in addition to the contract itself in order to determine the intention of the parties. In such instances, interpretation of the contract becomes a mixed question of law and fact." *Wadi Petroleum*, ¶ 12, 65 P.3d at 708 (citations omitted). "An ambiguous contract is one which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." *BNSF*, ¶ 22, 420 P.3d at 167 (quoting *Wadi Petroleum*, ¶ 12, 65 P.3d at 708). Whether an ambiguity exists is a question of law for the court to determine. *Caballo*, ¶ 11, 84 P.3d at 315 (citations omitted).

## C.     The August 2019 Stipulation

[¶17] In August 2019, the defendants executed a "Stipulation of Interests and Cross-Conveyance" (the Stipulation). Neither C Bar J nor William R. Hutton were parties to the stipulation. The Stipulation states it is "effective for all purposes as of May 13, 2008" and provides that its intent is "to clarify and forever resolve such title issues pertaining to all right, title and interest in and to all oil, gas and other minerals in, on and under" the Property. The Stipulation states that the parties to the C Bar J-Hutton Deed intended "to reserve to [C Bar J] one-half (1/2) of the fee mineral interest in [the Property] until May 7, 2007, upon which said date the one-half (1/2) term mineral interest would lapse vesting *the then owners* of [the Property] with said one-half (1/2) mineral interest[.]" (Emphasis added.) The Stipulation also states that it was the intent of the Hutton-Woods Deed to "reserve, to [the Huttons], the mineral interest owned [by them] at the time being one-half

(1/2) of the minerals in, on and under [the Property]."  Finally, the Stipulation declares that:

> it was the intent of the [Hutton-Woods Deed] that [the Huttons] were provided with the exclusive right to lease said one-half (1/2) mineral interest for the exploration and production of oil and gas during the lives of William R. Hutton and Charlotte J. Hutton but that any lease so executed by [the Huttons] of the 1994 Warranty Deed, or their assigns, would be effective only for the lives of William R. Hutton and Charlotte J. Hutton and that the remaindermen would be free to enter into their own oil and gas lease(s) covering said one-half (1/2) mineral interest following the deaths of [the Huttons].

[¶18]  The district court gave "great weight" to the Stipulation in determining ownership of the mineral rights and concluded the Huttons owned a life estate in 50% of the minerals. North Silo argues that the district court's reliance on the Stipulation disregarded our longstanding rules of contract interpretation.[5]  We agree.

[¶19]  It is well-settled that courts may consider extrinsic evidence "where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself[.]"  *Caballo*, ¶ 11, 84 P.3d at 315 (quoting *Hickman v. Groves*, 2003 WY 76, ¶ 11, 71 P.3d 256, 259 (Wyo. 2003)); *see also Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, ¶ 16, 191 P.3d 125, 131 (Wyo. 2008). In those instances, "the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties." *Caballo*, ¶ 11, 84 P.3d at 315 (quoting *Hickman*, ¶ 11, 71 P.3d at 259).  Courts may also look to extrinsic evidence when considering whether a contract is ambiguous.  *Id.*  We have explained that in doing so, courts "may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract.  **However, the court may not consider the parties' own extrinsic expressions of intent.**"  *Id.* (emphasis added) (quoting *Hickman*, ¶ 11, 71 P.3d at 260).

> [E]vidence of the parties' intent regarding what particular terms in their agreement mean is considered only when the contract is ambiguous.  Because we use an objective approach to interpret contracts, evidence of a party's subjective intent is

---

[5] North Silo also contends that the Stipulation is legally unsound because it does not include signatures of all the original parties to the deeds in the chain of title (C Bar J or its agents, and William Hutton) and because North Silo recorded its leases prior to the execution of the Stipulation, was not a party to the Stipulation, and did not ratify it.  We do not address these arguments.

not admissible, regardless of whether the court determines a
contract is ambiguous or clear.

*Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 23, 226 P.3d 889, 905 (Wyo. 2010) (citing
*Wells Fargo Bank Wyo., N.A. v. Hodder*, 2006 WY 128, ¶ 31, 144 P.3d 401, 412 (Wyo.
2006); *Omohundro v. Sullivan*, 2009 WY 38, ¶ 24, 202 P.3d 1077, 1084–85 (Wyo. 2009)).

[¶20]  The Stipulation is an after-the-fact expression of intent endorsed by some, but not
all, parties to the deeds at issue.  It is subjective intent evidence that our rules of contract
(and deed) interpretation exclude from a court's consideration.  It was improper for the
district court to consider the Stipulation, and we disregard it here.  We, as required by our
rules of interpretation, begin our analysis by looking to the language of the deeds.

**D.     The Relevant Deeds and Their Language**

[¶21]  The conveyances from C Bar J to the Huttons and from the Huttons to the Woods
are determinative as to mineral ownership and consequently to the minerals encumbered
by North Silo's current lease.

[¶22]  The parties do not dispute that after the conveyance, the Huttons owned all the
surface estate and one-half of the mineral estate.  They disagree about the effect of the C
Bar J reservation.  North Silo claims the C Bar J-Hutton Deed vested title to one-half of
the minerals in the Huttons outright and gave them a vested remainder in the other half of
the minerals which C Bar J had reserved.  After twenty years, the Huttons realized the
remainder, giving them a life estate in 100% of the minerals.  The remaining parties assert
the reserved minerals did not transfer to the Huttons.  The resolution of this dispute informs
the interpretation of all subsequent deeds and leases.  We turn first to the C Bar J-Hutton
Deed.

**1.     What was conveyed by the C Bar J-Hutton Deed, and to whom was it
conveyed?**

[¶23]  C Bar J reserved "One-Half of the existing mineral rights for 20 years" and "At the
end of the 20 years, the mineral rights [were] to become the property of the purchasers."
North Silo contends that, correctly interpreted, the C Bar J-Hutton Deed vested a future
interest in the reserved minerals in the Huttons.  The remaining parties argue that the
Huttons had only a contingent remainder, and ownership of the reserved minerals had not
yet vested in the Huttons when they sold the property to the Woods.  They claim the
contingency is rooted in the term "purchasers."  They assert "purchasers" refers to the
owner of the property at the end of the twenty-year reservation and not to the Huttons, who
are elsewhere referred to in the deed as "grantees."  They contend the Woods owned the
Property when the twenty years expired, making the Woods the "purchasers" and owners
of the reserved minerals rights.

[¶24]   We find the deed to be unambiguous and look to the plain language of the deed to determine the ownership interests reserved and conveyed.  C Bar J reserved one-half of the mineral estate for a definite term, twenty years.  *See Williams v. Watt*, 668 P.2d 620, 625–36 (Wyo. 1983); Restatement (Third) of Prop.: Wills and Donative Transfers § 24.6 (Am. L. Inst. 2011) ("The term of years is a present interest that terminates on the expiration of a term that is measured in one or more years . . . .").  C Bar J retained a present interest in the reserved half of the mineral estate.  It conveyed the remainder of this interest on the expiration of twenty years.  A remainder is a future interest created in a transferee.  *See* Restatement (Third) of Prop.: Wills and Donative Transfers § 25.2; 3 David A. Thomas, *Thompson on Real Property* § 23.02 (2012 & Supp. 2021).  Remainders can be contingent or vested.  Thomas, *supra*, § 23.02.  "A property interest vests at the point when no contingency can defeat the interest." *Jackson as Tr. of Phillip G. Jackson Fam. Revocable Tr. v. Montoya*, 2020 WY 116, ¶ 24, 471 P.3d 984, 989 (Wyo. 2020) (quoting *Shriners Hosps. for Child. v. First N. Bank of Wyo.*, 2016 WY 51, ¶ 32, 373 P.3d 392, 404 (Wyo. 2016)).

> The broad distinction between vested and contingent remainders is this: In the first, there is some person in esse known and ascertained, who, by the will or deed creating the estate, is to take and enjoy the estate, and whose right to such remainder no contingency can defeat.  In the second, it depends upon the happening of a contingent event, whether the estate limited as a remainder shall ever take effect at all.  The event may either never happen, or it may not happen until after the particular estate upon which it depended shall have been determined, so that the estate in remainder will never take effect.

*Jackson*, ¶ 24, 471 P.3d at 989 (quoting *Shriners Hosps.*, ¶ 32, 373 P.3d at 404).

[¶25]   In *Williams*, this Court considered mineral rights created by a grant excepting "an undivided one-half interest in all oil, gas, and mineral rights in and under the balance of the land for a period of 20 years . . . , and as long thereafter as [minerals] continue to be produced therefrom . . . ." *Williams*, 668 P.2d at 629.  We concluded that because the event upon which Williams was "to take the mineral estate is one certain to occur," Williams' interest in the disputed minerals was a vested remainder.  *Id.* at 632–33.

[¶26]   The remainder created in the C Bar J-Hutton Deed was vested if some person, "known and ascertained," took the estate under terms that no contingency could defeat.  The passage of twenty years was certain to occur and was not a contingency that could be defeated.  We turn next to the use of the term "purchasers."  If the "purchasers" were the Huttons, they were known and ascertained and their right to the remainder could not be

9

defeated. They had a vested remainder. If, on the other hand, "purchasers" did not refer to the Huttons, there was no "known and ascertained" person to take the estate, and the interest was a contingent remainder.

[¶27] The Woods argue they are the purchasers referred to in the deed because they had purchased the Property when the twenty-year reservation expired. In support of their argument, they point out that the deed does not specify that the mineral rights become the property of *the purchasers from the C Bar J* after twenty years. The Deselms and Singletree make similar arguments. They contend that while "the Huttons might have been the purchasers" at the end of the twenty-year term, "it was not 'certain and definite' they would be."

[¶28] The C Bar J-Hutton Deed states that C Bar J "does . . . grant, . . . sell, CONVEY AND WARRANT" the Property "for and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration." The C Bar J-Hutton Deed refers to C Bar J as "the GRANTOR" and "William R. Hutton and Charlotte J. Hutton, husband and wife" as "the GRANTEE." The deed conveyed the Property and "One-Half of the existing mineral rights for 20 years" and stated that "At the end of the 20 years, the mineral rights are to become the property of the purchasers."

[¶29] Turning to the use of the word "purchasers" versus the use of the word "grantee" in the C Bar J-Hutton Deed's reservation clause, we give the terms "grantee" and "purchaser" their plain and ordinary meaning. *Gilstrap*, ¶ 12, 106 P.3d at 862 (we interpret a "deed like a contract from specific language [in] the deed," and we give terms "their plain and ordinary meaning" (citation and quotation marks omitted)). Black's Law Dictionary defines grantee as "[o]ne to whom property is conveyed." *Grantee*, Black's Law Dictionary (11th ed. 2019). It defines purchaser as "[s]omeone who obtains property for money or other valuable consideration; a buyer." *Purchaser*, Black's Law Dictionary. While we can find no case that directly addresses these particular terms, many cases address interchangeable or synonymous terms and find any differences to be without distinction. *See, e.g.*, *Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1063 (Md. 1999); *Atlanta Dev. Auth. v. Clark Atlanta Univ., Inc.*, 784 S.E.2d 353, 358 (Ga. 2016); *Statham v. Kelly*, 584 S.E.2d 246 (Ga. 2003); *Corlett v. Cox*, 333 P.2d 619, 621 (Colo. 1958). Other cases have indirectly addressed the terms "grantee" and "purchaser" which are often used interchangeably. *See, e.g.*, *Choice Pers. No. Four, Inc. v. 1715 Johanna Square Ltd.*, No. 01-05-00830-CV, 2007 WL 1153046, at *5–6 (Tex. App. Apr. 13, 2007) (the terms "grantee" and "purchaser" were used interchangeably in the deed in question, and the court found the grantee was the purchaser); *Home Builders v. Jones*, 157 S.E. 521, 521 (Ga. Ct. App. 1931) (the court explained that "the purchaser" was the "grantee in the deed"). Any distinction is without significance when the deed itself unambiguously manifests the intent of the parties. *See O'Brien v. Vill. Land Co.*, 794 P.2d 246, 250 (Colo. 1990).

10

[¶30]   When we interpret deed language, we apply common sense, *Wadi Petroleum*, ¶ 11, 65 P.3d at 708, and give terms the "meaning [the] language would convey to reasonable persons at the time and place of its use." *Gilstrap*, ¶ 12, 106 P.3d at 862.  It contravenes common sense that at the time of the conveyance, "purchasers" would refer to uncontemplated future purchasers who might buy the property from the Huttons on some unknown future date.  In the C Bar J-Hutton Deed, the designations "grantee" and "purchasers" were used synonymously.  The Huttons were the grantees and the purchasers.

[¶31]   Even if we were to conclude that "the purchasers" is an ambiguous term, the parties' course of conduct after the conveyance is consistent with North Silo's interpretation of the deed.  "Course of conduct evidence may properly be considered in interpreting an ambiguous contract." *Whitney Holding Corp. v. Terry*, 2012 WY 21, ¶ 29, 270 P.3d 662, 671 (Wyo. 2012) (citing *B & R Builders v. Beilgard*, 915 P.2d 1195, 1198 (Wyo. 1996)).  In *Whitney Holding* we observed:

> The Terrys acted at all times as the owners of the mineral estate that was burdened by the Zimmerman life estate.  The Terrys executed and filed affidavits of survivorship reflecting termination of the Zimmerman life estate after Mr. Zimmerman died in 1988.  They entered into several oil and gas lease agreements.  They at all times acted as owners of the mineral estate.  Whitney, on the other hand, did nothing.  It took no action of any kind, until this lawsuit, to reflect that it claimed any interest in the mineral estate.  The course of conduct evidence was properly relied upon by the district court to interpret the deed and supports the district court's decision.

*Whitney Holding*, ¶ 29, 270 P.3d at 671.

[¶32]   Here, the Huttons acted as owners of all the mineral rights in the Property.  They executed an oil and gas lease with Cirque in 2010, and through 2015 they accepted bonus payments under that lease for 100% of the net mineral acreage.  The Appellees did nothing indicating they owned mineral interests during this time.  In fact, in subsequent transactions, they acknowledged that the Huttons owned a life estate in 100% of the minerals.  After acquiring the Property, the Woods sold the Property to the Deselms and in each of these transactions the contracts for deed provided:

> Buyer acknowledges and agrees that **all mineral rights associated with the Property were previously reserved by William and [Charlotte] Hutton for their joint lifetimes**, and that it cannot be determined with certainty when Sellers will acquire clear title to the mineral rights associated with the Property.

11

(Emphasis added.)

[¶33] It was not until August 2019, after North Silo began drilling operations on the property, that the Appellees took quarrel with the ownership of the mineral rights and executed the Stipulation. *See supra* ¶¶ 17–20.

[¶34] In the C Bar J-Hutton Deed, the designations "grantee" and "purchasers" were used synonymously. The C Bar J Deed identified the Huttons as the grantees. The Huttons paid valuable consideration for the property making them the purchasers. Given the unambiguous terms of the C Bar J Deed, the Huttons received a vested remainder in the reserved 50% of the minerals.

## 2. What did the Huttons reserve in the Hutton-Woods Deed?

[¶35] This brings us to the Hutton-Woods Deed. In 1992, the Huttons contracted to transfer their interest in the Property to the Woods. C Bar J's twenty-year reservation of 50% of the mineral interests had not expired. (Twenty years from May 7, 1987, the date of the C Bar J-Hutton Deed, was May 7, 2007.) As stated above, the Huttons owned 50% of the mineral interests and a vested remainder in the reserved mineral interests when they contracted with the Woods. The Hutton-Woods Deed, filed after the Woods satisfied the terms of the contract for deed in 2008, granted the Woods "all rights" to the Property with reservations:

> [The Huttons] **reserve to [themselves,] for the period of their lives,** *all minerals*, **including oil and gas they may own**, that may be on, in, under or produced from the above-described land.
>
> [The Huttons and the Huttons'] assigns shall, during their lives, have the exclusive right and privilege of making, executing and delivering leases of the land for the extraction or production of minerals. On termination of this reservation, the interest reserved shall be owned by [the Woods and the Woods'] heirs and assigns.

(Emphasis added.)

[¶36] We first consider whether the Huttons reserved their vested remainder. *Gilstrap* provides a framework for analyzing deeds with express reservations or exceptions:

> there are three quanta of interest that must be ascertained in order to construe a deed that contains a reservation. First, the

12

quantum of interest specified in the granting clause must be determined. If the granting clause does not expressly limit the grant to a lesser amount, then the quantum of interest purportedly conveyed is 100 percent of all right, title and interest. The next step in this process is to ascertain the quantum of interest reserved in a subsequent clause.

The final quantum to be determined is that quantum of interest the grantee is to receive under the deed. This amount can be calculated by subtracting the quantum of interest reserved to the grantor from the quantum of interest conveyed in the granting clause.

*Gilstrap*, ¶ 14, 106 P.3d at 863 (quoting *Cole v. Minor*, 518 So. 2d 61, 63 (Ala. 1987)).

[¶37]   The quantum of interest identified in the Hutton-Woods Deed granting clause is "all rights" to the Property. The plain meaning leads us to conclude the Huttons conveyed everything they owned, except as limited by the reservation. We next review the quantum of interest reserved. The Huttons expressly reserved for their lifetimes "all minerals . . . they may own." They also reserved "during their lives, . . . the exclusive right and privilege of making, executing and delivering leases of the land for the extraction or production of minerals." The district court concluded that the Huttons only owned 50% of the minerals, and they reserved only those minerals that they owned.

[¶38]   We held above that the Huttons owned a vested remainder in the C Bar J reserved minerals when they executed the Hutton-Woods contract for deed. The question presented is whether the Huttons' reservation of "all minerals" they "may own" in the deed included their vested remainder.

[¶39]   In *Williams v. Watt*, Williams owned a vested remainder interest in the disputed minerals. *Supra* ¶ 25; *Williams*, 668 P.2d at 632–33. He entered a contract for deed conveying his property to Watt. The deed expressly excepted, "all of the oil, gas and mineral rights . . . to which he is entitled under the present ownership . . . and which have not been . . . reserved or conveyed by previous owners[.]" *Williams*, 668 P.2d at 622. We held the reservation of "all" mineral rights "to which he is entitled" indicated the parties "intended to and did withhold from the grant to the Watts" Williams' vested remainder interest in the minerals. *Id.*

[¶40]   In *Rox Petroleum*, the Oklahoma Supreme Court reached a similar conclusion. In *Rox*, the grantors conveyed half of their mineral interests to two different oil companies "for a period of ten (10) years, and as long thereafter as oil and gas is produced[.]" *Rox Petroleum, L.L.C. v. New Dominion, L.L.C.*, ¶ 3, 184 P.3d 502, 504 (Okla. 2008). The Oklahoma court held that, with respect to this half of the minerals, the grantors were left

13

with a "possibility of reverter" once the minerals were no longer produced. *Id.* ¶¶ 11–12, 184 P.3d at 505–06. The grantors' heirs later conveyed the property to the Oklahoma City Chamber of Commerce. Those deeds excepted "all the oil, gas and other minerals, all that portion of such minerals now owned by grantors being reserved by them[.]" *Id.* ¶ 4, 184 P.3d at 504. The court concluded that the reservation of "all" of the grantors' mineral interests "is a clearly expressed intention, without ambiguity, to reserve the possibility of reverter since it was part of the . . . minerals owned by the grantors at the time." *Rox Petroleum*, ¶ 12, 184 P.3d at 505; *see also Crosswhite v. McCully*, 857 P.2d 90, 90 (Okla. Civ. App. 1993) (reservation of "all of the oil, gas, and other minerals" included reversionary interest).

[¶41] A reservation of "all minerals . . . they may own" applies to vested mineral interests owned at the time of the reservation. "'All' has . . . been defined as a word that ' . . . is commonly understood and usually does not admit of an exception, addition, or exclusion.'" *Johnson v. Safeway Stores, Inc.*, 568 P.2d 908, 911–12 (Wyo. 1977) (quoting *Consol. Freightways Corp. of Del. v. Nicholas*, 137 N.W.2d 900, 904 (Iowa 1965)). Here, the Huttons expressly reserved "all minerals . . . they may own" for their lifetimes. This clearly reserved a life estate in their presently held mineral interest and their vested remainder. The Hutton-Woods Deed provided that the Huttons, "during their lives, have the exclusive right and privilege of making, executing and delivering leases of the land for the extraction or production of minerals."[6] The Huttons reserved the executory rights to lease their presently held mineral interest and vested remainder.

[¶42] Finally, we must determine what interest the Woods received under the deed. "This amount can be calculated by subtracting the quantum of interest reserved to the grantor from the quantum of interest conveyed in the granting clause." *Gilstrap*, ¶ 14, 106 P.3d at 863 (quoting *Cole*, 518 So. 2d at 63). The quantum of interest the Woods received was "all rights" to the Property, *see supra* ¶ 35, less the quantum reserved by the Huttons—"all minerals . . . they may own" (a present life estate in 50% of the minerals and a life estate in the vested remainder in the remaining 50% of the minerals, which were owned by C Bar J for a term of years). The Woods received the Property subject to the Huttons' reservation of a life estate in 100% of the mineral interests and the executory rights to lease those minerals.

## E.  The Authority to Lease the Minerals

[¶43] The final deed interpretation question is the scope of the Huttons' rights to encumber the minerals. The district court concluded that the Huttons' executive rights permitted them to execute leases but any such lease is limited by their life estate and cannot extend beyond their lifetimes. North Silo argues that because the Huttons reserved the mineral

---

[6] "[T]he right to give a mineral lease is usually called the executive power." *Picard v. Richards*, 366 P.2d 119, 124 (Wyo. 1961). We refer to this right as the executive right or executory rights.

estate and executive rights for life, they can execute leases that extend past their life estate. The Deselms and Singletree Appellees contend that the Huttons did not have the right to enter leases that extend beyond their lifetimes.

[¶44]  The extent to which a party holding a life estate in minerals and executive rights may encumber mineral rights is a question of first impression for this Court.  Other courts considering the question have held that reserved executive rights can empower a party holding a life estate to execute leases beyond the life estate term.  *See, e.g.*, *RLM Petroleum Corp. v. Emmerich*, 896 P.2d 531, 535 (Okla. 1995); *Steger v. Muenster Drilling Co.*, 134 S.W.3d 359, 373 (Tex. App. 2003); *Glass v. Skelly Oil Co.*, 469 S.W.2d 237, 240–41 (Tex. Civ. App. 1971), *writ refused NRE* (Nov. 10, 1971); *Amarillo Oil Co. v. McBride*, 67 S.W.2d 1098, 1100–01 (Tex. Civ. App. 1934), *writ refused*.  They reason that, while typically a lease executed by a term interest holder would not endure beyond the interest holder's estate, "if a life tenant is granted the power to lease, but cannot bind future interests, 'there is very little utility to the power because of the natural reluctance of any lessee to accept a lease which might be terminated by the death of the lessor.'"  *Steger*, 134 S.W.3d at 374 (quoting 1 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 8.1, at 214 (1987)).

[¶45]  The determination of whether the reservation of executive rights allows a life tenant to execute mineral leases that extend beyond their lifetime requires examination of the deed language.  *Steger*, 134 S.W.3d at 373 (looking to the "plain, ordinary meaning of the terms used in" the will conveying executive rights).

[¶46]  In *Steger*, 134 S.W.3d at 373, the decedent's will granted one life tenant the "full[] power and authority" to "manage, control and lease" a specific mineral interest (the J.W. Maddox interest) "*for all purposes* . . . during her [lifetime] and to extract therefrom all oil, gas and or other minerals."  It gave the other life tenant the power, "during . . . her [lifetime]," to "make leases *of whatever nature*" to other mineral interests on Tracts 1–3 "and to extract therefrom all oil, gas and/or other minerals . . . over which . . . she may have control."  The court held that:

> Construing these terms in accordance with their ordinary meanings, [the] will unambiguously authorized [the first life tenant] to lease [her] half of the community for every end that she sought to attain, including the end of making oil and gas leases that extended beyond her lifetime, and gave [the second life tenant] the power to execute oil and gas leases of any kind or class at all, including those that extended beyond her lifetime.

*Id.* at 373–74.  The *Steger* court concluded, "In light of this unambiguous language, we decline to hold, as Mrs. Steger urges, that the *time limits* [the decedent] placed on [the life

15

tenant's] exercise of the powers granted to her—her lifetime—limited the *types* of leases she could enter." *Id.* at 374.

[¶47] In *Peppers Refining Co. v. Barkett*, the grantor conveyed a one-half mineral interest to grantees for a period of twenty-five years with the mineral interest reverting back to grantor at the end of that period. The grant of the mineral interest included "all grantor's rights to operate for said minerals" and the right to "deal and contract with regard thereto." *Peppers Ref. Co. v. Barkett*, 256 P.2d 443, 445 (Okla. 1953). The *Peppers* court held that the leases entered into by the grantee could extend past the term of the mineral interest grant:

> Only one conclusion can be reached in interpreting this language. The mineral interest was conveyed to plaintiffs for the term of 25 years only, but any leases executed within that period did not expire at the same time. They continued in force subject only to the reversion of the royalty or mineral interest to the defendants herein. It is no different from the situation which would have obtained had defendants conveyed the minerals outright to plaintiffs with the provision that they would, at the end of 25 years be reconveyed, subject to the rights of lessees, under the terms of existing leases. As to [grantees], at the end of said period, their interest and estates in the lands and their rights under the leases ceased. The rights of lessors to the benefits flowing from an oil and gas lease are not personal but inure to the owner of the minerals or of the royalty interest in those minerals if such royalty interest has been carved out of, and alienated from, the mineral estate. In the instant case that had not been done. The minerals had been conveyed. Twenty-five years later, they reverted burdened only by the outstanding leasehold estate.

*Id.* at 446.

[¶48] The Oklahoma court considered different language in *RLM*. There, the court recognized that if a grantee is "specifically given the power to lease, any lease granted should be capable of enduring beyond the specified term of years." *RLM*, 896 P.2d at 535. The court explained,

> It is possible to create an interest in the minerals alone which is terminable upon the expiration of a definite period of time. It is difficult to classify such an interest in terms of conventional property law, but it is obviously a greater interest than an estate for years. It is either an estate for years without

impeachment for waste, an estate for years to which the open mine doctrine applies, or is a fee, from the standpoint of enjoyment, which is terminable upon a certain date. The owner of such an interest has a right to extract and retain minerals produced and undoubtedly can confer the right upon another by an oil and gas lease. *Such a lease would not ordinarily be capable of enduring beyond the term of the grantor's estate, but if he is specifically given the power to lease, any lease granted should be capable of enduring beyond the specified term of years.*

*Id.* at 535 (alteration in original) (emphasis added) (quoting 2 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 20.5, at 128 (1989)). In *RLM*, the grantors reserved a 25-year mineral interest, expressly providing "that at the end of the 25-year period, *all* mineral rights including *the right of leasing mineral rights* and the right of egress for development of the minerals will return to the record owner." *Id.* The *RLM* court concluded that this language limited the extent to which the term interest holder could lease the minerals:

The deed expressly provides that at the end of the 25-year period, *all* mineral rights including *the right of leasing mineral rights* and the right of egress for development of the minerals will return to the record owner. There is no indication that the [grantors] agreed to be subject to any leases entered by the term mineral interest holder.

*Id.* at 535–36.

[¶49]  Here, the Huttons' executive rights reservation stated that they "shall, during their lives, have the exclusive right and privilege of making, executing and delivering leases of the land for the extraction or production of minerals. On termination of this reservation, the interest reserved shall be owned by Grantees . . . ." This reservation of rights limits the time period during which the Huttons have the right of "making, executing and delivering leases" to their lifetimes. It does not, however, limit the nature of the leases that the Huttons can make—it does not limit the length of the leases the Huttons could enter to their lifetimes. The Huttons retained the power to execute oil and gas leases that extended beyond their respective lifetimes. When the Huttons entered the mineral lease with Cirque, they leased "all" the mineral interests they owned—100% of the mineral interest in the Property for their lifetimes.[7]  Accordingly, the lease to North Silo remains in effect according to its terms when the Huttons' life estate terminates.

---

[7] This conclusion renders erroneous the district court's conclusion that North Silo was liable to the Woods and Singletree defendants for conversion, and its order that North Silo prepare an accounting and pay the Woods proceeds for their share of the mineral interests.

17

## II. Does North Silo have standing to assert a claim seeking to quiet title to its leasehold and for breach of lease?

[¶50] North Silo sought to quiet title to its leasehold interest in the Property.[8] The district court held that North Silo lacked standing to quiet title because it was not a mineral owner. The district court also held that because North Silo could not pursue its quiet title action, "it follows that it cannot litigate a claim for breach of [l]ease based on a failure to defend title to the lands and minerals covered by that lease." We first consider North Silo's standing to quiet title and then its claim for breach of lease.

### A. Standard of Review

[¶51] "The existence of standing is a legal issue reviewed de novo." *HB Fam. Ltd. P'ship v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2020 WY 98, ¶ 16, 468 P.3d 1081, 1087 (Wyo. 2020) (citing *N. Laramie Range Found. v. Converse Cnty. Bd. of Cnty. Comm'rs*, 2012 WY 158, ¶ 22, 290 P.3d 1063, 1073 (Wyo. 2012); *Halliburton Energy Servs., Inc. v. Gunter*, 2007 WY 151, ¶ 10, 167 P.3d 645, 649 (Wyo. 2007)).

### B. Standing to Quiet Title

[¶52] Statutory standing exists when a plaintiff has a cause of action under a particular statute. *HB*, ¶ 19, 468 P.3d at 1088.[9] Wyo. Stat. Ann. § 1-32-201 establishes who may seek to quiet title:

> [A quiet title] action may be brought by a person in possession of real property against any person who claims an estate or interest therein adverse to him, for the purpose of determining the adverse estate or interest. . . .

Wyo. Stat. Ann. § 1-32-201 (LexisNexis 2021).

---

[8] North Silo claimed it "is entitled to a decree quieting title as to the effectiveness of the Lease covering 100% of the mineral interest in the Property against any claims thereto by" the defendants.

[9] "We have drawn a distinction between 'prudential' and 'statutory' standing." *HB*, ¶¶ 15–19, 468 P.3d at 1087–88 (citing *Matter of Est. of Stanford*, 2019 WY 94, ¶ 9, 448 P.3d 861, 864 (Wyo. 2019)). Prudential and statutory standing principles are "vital jurisprudential rules that assist courts in filtering cases," *Matter of Adoption of L-MHB*, 2018 WY 140, ¶ 24, 431 P.3d 560, 568 (Wyo. 2018), and both ensure the courts provide relief to claimants who "have suffered, or will imminently suffer, actual harm[.]" *Allred v. Bebout*, 2018 WY 8, ¶ 30, 409 P.3d 260, 268 (Wyo. 2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996)). The *Brimmer* test evaluates prudential standing. *Stanford*, ¶ 10, 448 P.3d at 864; *see Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo. 1974); *Allred*, ¶ 37, 409 P.3d at 270. The defendants appear to argue that under the *Brimmer* test, North Silo lacks standing. We do not apply the *Brimmer* test for prudential standing when standing is established statutorily. *HB*, ¶¶ 15–19, 468 P.3d at 1087–88.

[¶53]   The language of Wyo. Stat. Ann. § 1-32-201 is unambiguous.  To maintain a quiet title action, a plaintiff must have (1) possession of the real property,[10] (2) some interest in the property, and (3) the party against whom the action is brought must claim "an estate or interest" adverse to the plaintiff.  *See Ultra Res.*, ¶ 51, 226 P.3d at 911 ("In a claim for declaration of ownership of real property, i.e., quiet title, the plaintiff must allege an interest in the real property and the defendant 'claims an estate or interest adverse to him.'" (quoting Wyo. Stat. Ann. § 1-32-201)); *Hirsch v. McNeill*, 870 P.2d 1057, 1059 (Wyo. 1994) ("In order to maintain a quiet title action, the plaintiff must have (1) possession, and (2) legal title or some interest in the property." (citing *Black v. Beagle*, 59 Wyo. 268, 286, 140 P.2d 594, 595 (1943))).

[¶54]   The parties do not dispute that North Silo has a mineral lease, is in possession of the property, or that its interests are adverse to the defendants.  The Deselms defendants contend that North Silo lacks standing to quiet title because it has no fee interest in the minerals.  The question is whether North Silo's mineral lease qualifies as an interest in property under the statute.[11]

> In some jurisdictions, the lessee under an oil and gas lease acquires no corporeal interest in the land itself, but rather

---

[10] Regarding possession, we have explained:
> "[T]he reason that possession in some degree is usually a prerequisite to bringing a quiet title suit is that a legal remedy is ordinarily available to one out of possession."  65 Am. Jur. 2d *Quieting Title and Determination of Adverse Claims* § 36, at 170 (1972).  When no other remedy is available, however, the claimant may maintain an action to quiet the title to the property even though he does not have possession of it.  *Id.*  Additionally, "[i]f the land is in a natural condition, uninclosed [sic] by fences, and vacant, the person holding title to the land may initiate a quiet title action even without allegation or proof of possession on his part."  65 Am. Jur. 2d, *supra*, § 43, at 175.  In that instance, the title holder is presumed to have constructive possession of the land.  *Id.*; *see also* 1 Herbert T. Tiffany, *The Law of Real Property* § 20 (3d ed. 1939 & Supp. 1995).

*Goodrich v. Stobbe*, 908 P.2d 416, 418 (Wyo. 1995).

[11] We have considered whether parties have sufficient interests to give rise to a quiet title action on other occasions.  In *Ultra Resources*, we considered whether the defendants had an adverse interest in the property.  We held that the plaintiffs in that case could not assert a quiet title action against the defendants because the defendants did not make a claim to title.  If a defendant "does not make a claim to title, there is no dispute to adjudicate."  *See Ultra Res.*, ¶ 53, 226 P.3d at 912.  In other words, because the defendants did not claim an interest adverse to the plaintiff, the plaintiff could not quiet title.  *See* Wyo. Stat. Ann. § 1-32-201.  In *Hirsch*, the plaintiffs, whose property had been seized and sold to satisfy federal tax liens, sought to quiet title.  We held that because their tax judgment had gone unappealed, the plaintiffs no longer had an interest in the property and could not state a quiet title claim as a matter of law.  *Hirsch*, 870 P.2d at 1060.  Here, unlike *Ultra Resources*, there is no dispute that the defendants claimed an interest adverse to North Silo.  As in *Hirsch*, the question is whether North Silo has an interest in the property that would give rise to its ability to seek to quiet title.

a privilege a prendre; until the actual discovery of oil, the interest of the lessee in the land is inchoate. On these principles, oil remaining in the ground before recovery is a part of the land and belongs to the owner of the land, but when recovered, becomes personal property which is thereupon subject to division in accordance with the terms of the contract of lease. However, the profit a prendre has also been described as an interest in real property in the nature of an incorporeal hereditament. Under this view, the owner of land has the exclusive right on his or her land to drill for and produce oil; this right, when transferred to a lessee, is a profit a prendre, a right to remove a part of the substance of the land. As such, an oil and gas lease conveys a license to explore, or a profit a prendre. Like other easements, a profit a prendre, often simply referred to as a "profit," is an incorporeal hereditament or an intangible right in the land, and while easements generally allow one to go onto land owned by another person, a "profit" allows one not only to go onto the land of another but also to take some product from the land.

38 Am. Jur. 2d *Gas and Oil* § 65, at 481 (2019) (footnotes omitted). "In Wyoming, the right created by an oil and gas lease is a profit á prendre, connoting the right 'to search for oil and gas and if either is found, to remove it from the land . . . .'" *State v. Pennzoil Co.*, 752 P.2d 975, 980 (Wyo. 1988) (quoting *Denver Joint Stock Land Bank of Denver v. Dixon*, 57 Wyo. 523, 122 P.2d 842, 847 (1942)); *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370, 373 (1932) (holding that oil and gas leases are profits a prendre and incorporeal hereditaments).

[¶55] *State ex rel. State Highway Comm'n v. Stringer*, 77 Wyo. 198, 209–10, 310 P.2d 730, 733–34 (1957) addressed the question of whether the owners of an oil and gas lease were subject to notice requirements for the construction of public roads. Wyoming Statute § 48-316 required notice be mailed to "all persons owning lands or claiming **any interest in any lands** over or across which said road is proposed to be located[.]" Wyo. Stat. § 48-316 (W.C.S. 1945) (emphasis added). The State Highway Commission argued that because an oil and gas lease was a profit a prendre, it was not an interest in real property subject to statutory notice requirements. This Court rejected that argument:

> The *Boatman* case itself states that an oil and gas lease constitutes a *right*; and 2 Tiffany, Real Property, 2d ed., p. 1397, therein cited, contains this statement which we think is conclusive:

> . . . Since the grant of such a right [*profit a prendre*] involves a transfer of an interest in land, it must be created by writing . . . .
>
> Clearly, **an oil and gas lease is 'an interest in land' within the meaning of § 48-316**.

*Stringer*, 77 Wyo. at 209–10, 310 P.2d at 733–34 (emphasis added). In *Ready v. Texaco*, we clarified that the right to a profit a prendre provided in an oil and gas lease "is part of the realty." *Ready v. Texaco, Inc.*, 410 P.2d 983, 985–86 (Wyo. 1966). *See also* 58 C.J.S. *Mines and Minerals* § 244, at 239 (2017) ("A mineral lease does not create the ordinary relation of landlord and tenant; instead, it conveys an interest in real property.").

[¶56] Wyo. Stat. Ann. § 1-32-201 provides that to bring a quiet title action, a person must "claim[] an estate or interest" in the land. An oil and gas lease is an "interest" in land within the meaning of Wyo. Stat. Ann. § 1-32-201. North Silo has standing to seek to quiet title.

## C.    Standing to Claim Breach of Lease

[¶57] North Silo claimed that the Huttons breached their lease by failing to warrant and defend title to the minerals encumbered by the lease.[12] The district court's conclusion that North Silo lacked standing to bring this cause of action was erroneous. North Silo, as a party to the lease, has standing to assert a claim for its breach.

[¶58] An oil and gas lease is a contract. *Pennzoil*, 752 P.2d at 978. A breach of lease claim is akin to a breach of contract. An action for breach of contract is not statutorily derived. Accordingly, standing to bring a cause of action for breach of contract is prudential standing and requires application of the *Brimmer* test. *See supra* note 8; *Matter of Phyllis V. McDill Revocable Tr.*, 2022 WY 40, ¶ 29, 506 P.3d 753, 762 (Wyo. 2022); *Matter of Est. of Stanford*, 2019 WY 94, ¶ 9, 448 P.3d 861, 864 (Wyo. 2019); *Washakie Cnty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 317 (Wyo. 1980). The *Brimmer* test requires a justiciable controversy:

> First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third,

---

[12] Warranty clauses in oil and gas leases require the lessor to defend title to the lease's covered land. 4 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 52.2, at 319 (1990).

21

it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. Any controversy lacking these elements becomes an exercise in academics and is not properly before the courts for solution.

*Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo. 1974) (quoting *Sorenson v. City of Bellingham*, 496 P.2d 512, 517 (Wash. 1972)). Each of these qualifications is met in this case. North Silo, as a party to the lease, has standing to assert a breach of lease claim against the other party to the lease, the Huttons.

## *CONCLUSION*

[¶59] The Huttons owned 100% of the mineral interests in the Property and the executive rights to those minerals for their lives when they conveyed their interest to the Hutton Family Partnership. Accordingly, North Silo's mineral lease encumbers 100% of the minerals. The Huttons' executive rights allowed them to enter leases that extend beyond their lives. Finally, North Silo has standing to assert claims quieting title to its leasehold and for breach of lease. We reverse and remand for proceedings consistent with this opinion.